### STAATS v. BIOGRAPH CO.

#### (Circuit Court of Appeals, Second Circuit. July 3, 1916.)

#### No. 281.

1. CORPORATIONS ⏘152—DECLARATION OF DIVIDENDS—POWER OF DIRECTORS.

It is the general rule that, when a corporation has a surplus, whether a dividend shall be made rests on the fair and honest discretion of the directors, which cannot be controlled by the courts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 564–567; Dec. Dig. ⏘152.]

2. CORPORATIONS ⏘155(2)—DECLARATION OF DIVIDEND—POWER OF DIRECTORS TO RESCIND.

If a cash dividend is declared by a board of directors and is announced to the stockholders and the corporation has a sufficient surplus to pay the same, a debt is created, and the board has no power to rescind its action; but in case of a stock dividend, to be paid by an additional issue of stock, the board may rescind its action in good faith at any time before the stock is issued.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 561; Dec. Dig. ⏘155(2).]

3. CORPORATIONS ⏘155(2)—DECLARATION OF DIVIDEND—RESCISSION OF ACTION BY DIRECTORS.

The directors of defendant corporation declared a dividend to be evidenced by scrip certificates redeemable by defendant on or before a certain date at par in cash, stock, or evidences of indebtedness at its option. It had sufficient surplus to warrant the dividend. The certificates were not issued, and, the European War having seriously affected defendant's business, its directors rescinded the resolution declaring the dividend. *Held*, that such action was still within their power.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 561; Dec. Dig. ⏘155(2).]

In Error to District Court of United States for Southern District of New York.

Action at law by Richard H. Staats against the Biograph Company. Judgment for defendant, and plaintiff brings error. Affirmed.

The defendant is a corporation organized in 1895 pursuant to the laws of the state of New Jersey. It has an authorized capital of $2,000,000, and of this amount $1,999,000 is outstanding, and is engaged in the moving picture business.

The plaintiff is a citizen of the state of New York and is the record owner of 550 shares of the par value of $55,000 of the stock of the defendant company, and has been since prior to January 1, 1913.

On December 28, 1914, the board of directors of defendant declared a dividend of 50 per cent. on its outstanding capital stock, payable February 1, 1915, to the stockholders of record of January 18, 1915. The dividend as declared was payable February 1, 1915. It was to be paid in registered scrip certificates containing upon their face an agreement by the defendant that they might be converted on or before December 31, 1916, at par, without interest, wholly or partly in cash, wholly or partly at par, or wholly or partly in such form of interest-bearing obligation as might be deemed by the directors to the best interests of the company. Announcement of this action was made in a circular to the stockholders, dated December 28, 1914.

Without authorization from the stockholders and on August 10, 1915, and without the plaintiff's consent, the directors passed a resolution rescinding the declaration of the dividend previously declared, and this action was announced in a circular to the stockholders dated August 26, 1915.

⏘For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On September 14, 1915, the plaintiff made a demand on the defendant for the delivery of the registered scrip certificates which he claimed pursuant to the resolution of December 28, 1914. The demand was not complied with, and this action is brought to recover $27,500; that being the face amount of the scrip certificates which were issuable to him in respect of the $55,000 par value of the stock held by him. At the close of the trial of the action a motion was made to dismiss the complaint. That motion was denied. Both sides asked the court to direct a verdict, and a verdict was directed for the defendant; an exception being reserved for the plaintiff.

Van Vorst, Marshall & Smith, of New York City (Alexander B. Siegel, of New York City, of counsel), for plaintiff in error.

David Gerber, of New York City, for defendant in error.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The question involved herein concerns the power of a board of directors of a corporation to rescind a resolution declaring a scrip dividend, after the resolution declaring the dividend has been announced, and notwithstanding the existence of a surplus at the time of the adoption of both resolutions.

It is conceded that no dispute as to the facts exists. The decision below was limited by its terms to a decision against the plaintiff on questions of law alone.

Prior to 1913 the defendant company had paid cash dividends at the rate of 12 per cent. annually; but on February 28, 1913, the directors decided to reduce the rate to 6 per cent. annually.

The company had purchased land in the Bronx borough in New York City, upon which it proposed to construct a new plant. The reduction in the dividend was for the purpose of facilitating the completion and equipment of this new plant. On December 31, 1912, the company had a surplus of $831,149 after deducting a reserve for depreciation. All of this surplus was profit earned by the company in excess of dividends paid to the stockholders. The balance sheet of the company on June 30, 1915, shows that there was on that day a profit and loss surplus of $1,101,696.83. The evidence shows that at the end of every month during the year of 1915 the surplus always was in excess of $1,000,000. Nevertheless on August 10, 1915, the board adopted the following resolution:

"Resolved, that the action taken at the meeting of the board of directors held December 28, 1914, declaring a scrip dividend of fifty (50) per cent., be and the same is hereby rescinded."

It is not claimed that the corporation had between the time of the declaration of the dividend and its rescission suffered any unforeseen or material loss. All the surplus which existed when the resolution declaring the 50 per cent. scrip dividend was passed still existed when the revoking resolution was adopted, and in fact at the time the latter resolution was passed the surplus had been somewhat increased above what it was when the original declaration was made, and at no time since has it fallen below $1,000,000.

But it appears that intermediate the passage of the resolution declaring the dividend, December 28, 1914, and its rescission, August

10, 1915, the business of the company was seriously affected by the European War. Conditions had so changed that the officers of the company voluntarily consented that their salaries should be reduced. On his own request the president's expense allowance of $7,500 per annum was discontinued, and his salary, which had been $18,750 a year, was reduced to $15,000. The company had to borrow cash from its directors to meet its needs. The operating expenses of the company were about $50,000 a week. A few days prior to the adoption of the rescinding resolution, it borrowed from its president $27,000, who with others accepted the notes of the company unsecured by any collateral.

The president testified that:

"At the time the dividend was declared, the business had fallen off considerably, but it was believed from the best information obtainable that it would be only temporary shrinkage. Early in the following year, or say in the spring of the following year, the business fell off very rapidly, until it now amounts to practically nothing. There was also at the same time a very serious change in the business of this country and Canada. There were certain facts which the directors considered at their meeting of December 28, 1914, which were very encouraging and looked like a substantial change for the better. But within a very few months the reverse began to take place."

He was asked:

"You had difficulty in getting your films across into countries that are in war?"

And he replied:

"Well, we had more difficulty in getting orders. Formerly we would send a small positive print abroad of each production. That would be shown to the buyers on the other side, not only for European markets, but also for Australia. They would order on samples and on a certain day they would cable to ship so many positives. That meant that they ordered two or more weeks in advance of the time required. Later on conditions changed to such an extent that the various buyers would not place their orders more than a few days in advance of the time required for delivery, and we were obliged to ship machinery to the other side and hold our negatives here until we made all the positives we could sell or lease in the American and Canadian markets. Then we shipped the negatives to the other side, and had the positive prints made there, so that we could accept orders up to leaving less than 24 hours before the time required for delivery. That was a very serious change. Furthermore, the duty imposed was so great, the duty requirements put in force by the Canadian government, that our agent, the man who represents us in all foreign countries, cabled us to suspend all shipments even of positives. By that time the business ceased entirely."

The resolution of rescission was adopted after many hours of discussion of the American and of the foreign market.

No scrip dividend has been paid to a single stockholder, and apparently all the stockholders with the exception of this plaintiff have acquiesced in the action of the directors. If this action can be maintained and the plaintiff can recover the damages he sues for and other stockholders insist on like payments to them, it will require approximately $1,000,000, an amount which probably could only be realized by converting this company's fixed assets into cash and winding up its business. The question presented is one of considerable importance, and has received careful consideration.

[1] This seems to be an attempt on the part of a single stockholder to dictate to a directorate and to compel it against its will and honest

judgment to pay a dividend to him in cash or stock. The general rule is well established that, when a corporation has a surplus, whether a dividend shall be made rests in the fair and honest discretion of the directors, uncontrollable by the courts. Williams v. Western Union Telegraph Co., 93 N. Y. 162; Gibbons v. Mahon, 136 U. S. 549, 565, 10 Sup. Ct. 1057, 34 L. Ed. 525 (1890).

There have been numerous attempts to induce courts to interfere with directors in the exercise of their discretion, but they have quite uniformly refused to do so, unless it appeared that the directors had willfully abused their discretion and acted in bad faith and in neglect of duty. It takes a very strong case to induce a court to order directors to declare a dividend. A court has no jurisdiction to do so unless fraud or a breach of trust is involved. Cook on Corporations (7th Ed.) vol. 2, § 545, p. 1588.

In the case at bar there is nothing to lead us to doubt the perfect honesty and good faith of this board of directors, and the soundness of their judgment in this matter. But this plaintiff is not in this court asking us to compel the board of directors to declare a dividend. He is here, he asserts, because the board has declared the dividend and announced it, and then recalled its action and rescinded the vote.

In proper cases courts protect minorities, even minorities of one, against the oppression of the majority of stockholders and of boards of directors. It sometimes happens, however, that a minority institute "strike" suits and seek to oppress majorities and to involve the corporation itself in disaster for purposes of their own and for reasons not always revealed. So that there are cases in which courts are compelled to protect minorities against majorities and majorities against minorities.

In this case it does not escape observation that the plaintiff's right to a stock dividend, if he has such a right and can enforce it, would gain him nothing. We say it would gain him nothing, because, while a stock dividend would increase the number of his shares, it proportionately diminishes the value of each of his shares, leaving the aggregate value as it was before. He acquires the ownership of more shares, but he adds nothing to his proportionate ownership of the assets of the corporation. Green v. Bissell, 79 Conn. 547, 555, 65 Atl. 1056, 8 L. R. A. (N. S.) 1011, 118 Am. St. Rep. 156, 9 Ann. Cas. 287 (1907). What he expects through this suit is not the stock but the cash value of the stock. But the question which this court must pass upon, whatever the consequences in this particular case may be, is whether a board of directors, having declared the dividend in the form already stated, had the power to rescind its action.

We may, however, remark in passing that while it might be very disastrous to the welfare of the defendant, under the circumstances in which it now finds itself, if any large number of its stockholders could come into a court of law as this plaintiff has done and enforce the demand that they receive the value of the stock dividend as declared, yet the corporation might easily have avoided any such situation. For we confess our inability to see how the corporation or its stockholders

could in the least degree have been prejudiced if the scrip dividend had been issued as originally voted, and the corporation had then elected to pay it in stock. The property of the corporation would not have been impaired in the slightest extent.

The right to reconsider the declaration of a dividend would seem to depend upon the circumstances under which the dividend was declared, as well as upon the character of the dividend itself.

1. If a board of directors, for example, should declare a dividend, and, before any public announcement of the action has been made, should reconsider the vote and rescind the action, its right to do so, perhaps, could not successfully be challenged.

2. If a board of directors should declare a dividend when there are at the time the declaration is made no profits to divide, and if public announcement of the declaration of the dividend should be made, it may be that the right to reconsider and rescind would not be denied. Until such a dividend is paid there would seem to be a locus poenitentiæ, and the directors might recall their ultra vires act. They would not be under any obligation to consummate an illegal act which is merely in fieri. Thompson on Corporations, vol. 2, § 2135.

[2] 3. But if a board of directors should declare a cash dividend and make a public announcement of the fact, the courts have held that thereafter the board has no right to reconsider and rescind its action. The reason seems to be that the declaration of the dividend sets apart from the profits of the corporation a sum which is to be paid to the stockholders in proportion to their shares, and that it creates a debt due from the corporation to each shareholder, resulting in the relation of debtor and creditor. A dividend divides the property which belongs to the corporation into that which the corporation retains and that which the corporation agrees to pay to the stockholders, and which it is thereby bound to pay. That which one person is bound to pay to another is a debt. Lockhart v. Van Alstyne, 31 Mich. 76, 78, 18 Am. Rep. 156 (1875). Such a dividend cannot be rescinded because a debtor does not have it within his power to "rescind" his debt. Beers v. Bridgeport Spring Co., 42 Conn. 17 (1875); McLaren v. Planing Mill Co., 117 Mo. App. 40, 50, 93 S. W. 819 (1906); King v. Patterson, etc., R. Co., 29 N. J. Law, 82, 87 (1860); Ford v. Easthampton Rubber Thread Co., 158 Mass. 84, 32 N. E. 1036, 20 L. R. A. 65, 35 Am. St. Rep. 462 (1893); Cook on Corporations (7th Ed.) vol. 2, § 541, p. 1580. And sometimes the corporation becomes not merely a debtor, but is a trustee, as where the corporation has not only declared a dividend, but has deposited a fund out of which the dividends are to be paid. Le Roy v. Globe Insurance Co., 2 Edw. ch. 657 (N. Y.) (1836); Van Dyck v. McQuade, 86 N. Y. 38, 52 (1881). A trust relation, having been established, cannot be terminated at the pleasure of the board of directors by a vote rescinding its former action.

In Taylor on Corporations (5th Ed.) § 568, it is said that:

"The discretion of the corporate management is exhausted in declaring the dividend; thereupon their only function is to pay it to the stockholders."

So in Machen on Modern Law of Corporations, vol. 2, § 1358, that writer says:

"As a dividend when declared becomes a debt of the company, it follows that a dividend once properly declared, cannot be revoked."

Morawetz, in his book on Corporations (volume 1, § 445), says that:

"A dividend properly declared by the directors of a corporation cannot subsequently be revoked; those persons who were shareholders on the books of the company at the time when the dividend was declared have a legal claim against the company for the payment of the amount of the dividend."

And in Marshall on Corporations, § 283, it is said:

"Since the right of the stockholders of a corporation to a dividend becomes vested as soon as the dividend has been fully declared by the directors, and the corporation becomes their debtor for their respective shares, it follows that neither the same board of directors nor their successors can afterwards reconsider their action and revoke the declaration without the stockholders' consent."

4. A difference seems to exist between a cash dividend and a stock dividend, so that, if a board of directors declare a stock dividend, the authorities appear to recognize the right of the board subsequently to rescind its action at any time prior to the actual issuance of the stock.

The leading case on the subject is that of Terry v. Eagle Lock Co., 47 Conn. 141 (1879). It appears in that case that at a meeting of stockholders of the defendant company held on August 5, 1875, it was voted to increase the capital stock 2,000 shares, and that the said increase be out of the surplus earnings of the company. It was at the same time voted that the directors be authorized and directed to cause the stock to be issued to the present stockholders pro rata. On August 18, 1875, a specially called stockholders' meeting was held, and a vote was passed rescinding the vote of August 5th increasing the capital stock. The plaintiff stockholder who had not been present at the meeting at which the former vote was rescinded asked to have his pro rata share of the increase issued to him, or the value thereof paid to him, claiming that by the first vote he had a vested right of which he could not be deprived by the subsequent rescission. The court, in referring to the alternative prayer in the plaintiff's petition asking for a proportionate part of the supposed increase of stock or the cash value of his proportion of the increase, declared it very clear that the alternative prayer ought not to be granted, as it would in effect be making it a cash dividend, something "the company never intended. It would withdraw from the working funds of the company that amount which would not have been the result had the stock dividend been carried into effect. It is in effect asking the court to make a dividend instead of enforcing one made by the company." The Connecticut court denied, also, the stockholders' right to compel the company to issue the stock certificates, and it clearly pointed out the difference existing between a cash and a stock dividend. In the course of its opinion the court said:

"There is a difference, however, between a cash and a stock dividend. The former is created by a simple vote of the directors, and the amount thereby becomes severed from the general fund and belongs to the stockholders pro

rata. The latter can be initiated only by a vote of the stockholders. That is followed by issuing the stock, and the increase can only be completed legally by filing with the town clerk and with the secretary of the state the certificates required by law. Suppose the vote had been to increase, not from the surplus earnings, but by a sale of the newly created stock. In such a case, it cannot be said that the capital is actually increased until the new stock is subscribed for at least. Until then there is an element of uncertainty about it. It may never be taken. It is very clear that the vote to increase is not per se an increase. Nor it is such where the increase contemplated is from the surplus earnings.

"Again, a cash dividend entitles the stockholder to so much money, the ordinary way in which he receives from time to time the fruits of his investment. Such dividends do not materially affect the value of the stock. A stock dividend is exceptional. It does not add to his ready cash, but it changes the form of his investment by increasing his number of shares thereby diminishing the value of each share, leaving the aggregate value of all his stock substantially the same. It is of no special importance whether that value be divided into few or many shares.

"These differences are somewhat material, and serve to show that the petitioner's right, if he has such a right, to an increase of the number of his shares, was at the time a mere nominal right, and one which possessed no appreciable pecuniary value. It is at least doubtful whether a court of equity will in any case aid in enforcing such a right. But however this may be, there are other reasons of a pretty substantial character why the prayer of the petition should not be granted.

"The petitioner's right, as we have seen, was a mere naked right which he might waive without losing anything, and might enforce, if it could be enforced, without gaining anything. It became a mere question of expediency —shall the surplus be actually converted into capital, or remain surplus and be used as capital? The corporation chose the latter; and the petitioner, having nothing to gain or lose in either case, acquiesced in that decision."

In Dock v. Schlichter Jute Cordage Co., 167 Pa. 370, 379, 31 Atl. 656 (1895), a stock dividend was declared on July 16, 1890, and on March 16, 1891, it was rescinded. The court held that a resolution adopted by the directors of a corporation distributing among the shareholders shares of stock of the company which had been purchased by the company out of its earnings cannot be subsequently rescinded where it is not shown that such distribution would be injurious to the business of the company. It was said that if, upon the declaration of a dividend, the company deposited the moneys to pay the dividends with a banker and drew its check to the order of each entitled on the fund so deposited, or, in the case of a stock dividend if the company executed its power of attorney to transfer the shares and these awaited delivery, the stockholder's right would be a vested one which could not be taken from him by a rescinding vote of the directors. Then followed this statement:

"It is believed that, when there has been no such appropriation as that above mentioned, a company by its board of directors in a proper case and for cause may rescind a resolution declaring a dividend; as where owing to destruction of a plant by fire immediately following such resolution. If in the business and honest judgment of the board the earnings intended to be distributed should be recalled and used for the restoration of the destroyed property, it would be within its power to so deal with them; but, unless some similar thing appear, the declaration of a dividend of earnings is the announcement of an obligation due each shareholder for which proceedings may be had as legal methods indicate, and the burden of manifesting that the debt or obligation is not due after such a declaration is upon the company."

In the above case the court wrote no opinion, but affirmed "on the clear, concise and convincing report of the master."

In Billingham v. Gleason Mfg. Co., 101 App. Div. 476, 91 N. Y. Supp. 1046, the directors passed a resolution providing for a regular cash dividend and for a scrip dividend. The scrip certificates were issued, and the court held that they constituted an indebtedness. An action was brought on one of them against the company, and the court held the action maintainable, and in speaking of the certificate the court said:

"It was so much set apart and reserved for him as undivided earnings. His share was ascertained and his right to it was fixed. It was a divided share of past earnings, and, as we think, became a severed indebtedness of the company, for nothing is better understood than that a dividend when declared is a debt due absolutely to the stockholders."

In the case at bar the scrip certificates were never issued.

In Machen on Modern Law of Corporations, vol. 1, § 601, the law is stated as follows:

"Rescission of Stock Dividends. A stock dividend should also be distinguished from a cash dividend, in that, in the case of cash dividend, the right of the shareholder becomes indefeasible immediately upon the declaration of the dividend, and the company cannot subsequently rescind its action. In the case of a stock dividend, on the other hand, until the formalities required by law as conditions precedent to an increase of capital have been completed, all is in fieri, so that until then the company may revoke the dividend. The reason of this rule applies, however, only where the stock dividend involves an increase of the company's nominal capital, and therefore a dividend payable in shares which had been purchased by the company should be in this respect assimilated to a cash dividend and is irrevocable."

[3] It is undoubtedly true that directors may repeal any previous resolution or rescind any previous action unless repeal or rescission would involve a breach of contract or disturb a vested right. The resolution originally adopted by the directors certainly created no debt. The declaration was not to pay a cash dividend absolutely, for the directors had an option which they reserved as to whether they would or would not pay in cash. The distinguishing and necessary feature of a "debt" is that a fixed and specific amount is owing by a certain and express agreement, and that does not exist under the circumstances we find in this case. The directors did not bind themselves to pay a cash dividend absolutely, and in all events, and if they should ultimately elect to pay in cash, they were left free to determine how much should be in cash and how much should be in stock. And as to the declaration as to the stock dividend it should be said that the whole matter rested in fieri, and, not having become obligatory, was subject to repeal.

Notwithstanding the fact that the resolution declaring the dividend reserved to the corporation an option to pay in cash or to pay in stock, the plaintiff demands $27,500, the amount he would be entitled to receive if the dividend were paid in cash. But the law is well settled that where one is bound by covenants to do one of two things, and does neither, then, in an action by the covenantee, the measure of damages is in general the loss arising by reason of the covenantor having failed to do that which is least, not that which is most bene-

ficial to the covenantee; and the courts of equity have applied the same principle to the case of a trustee failing to invest in either of two modes equally lawful by the terms of the trust. See Robinson v. Robinson, 1 De Gex, M. & G. 247.

It would seem that, if the resolution declaring the dividend could be held in law to have created a contractual obligation, then as an option was reserved the corporation would have the right to insist that its liability should be restricted to damages for its failure to do that which is least beneficial to the promisee. In this case that would be to restrict its liability to the damages which arose from the failure to issue the stock dividend; and according to the decision in Terry v. Eagle Lock Company, supra, the right to the stock dividend is a "mere naked right which he might waive without losing anything, and might enforce, if it could be enforced, without gaining anything." At the most, the damage would be nominal. If the defendant had performed, the complainant simply would have had the number of his shares of stock increased and the value of each share in the same proportion decreased.

The action taken by the directors on December 28, 1914, which declared the scrip dividend and which was subsequently repealed, as already stated, declared a dividend payable on February 1, 1915, in registered scrip certificates containing upon their face an agreement by the company that they should be converted on or before December 31, 1916, at par without interest, wholly or partly in cash, wholly or partly in stock at par, or wholly or partly in such form of interest-bearing obligation as might be deemed by the directors to be for the best interest of the company. This is not a suit in equity to compel specific performance and the issuance of the scrip certificates, but it is an action at law for damages for the failure to perform the agreement and issue the registered scrip certificates payable on February 1, 1915. The suit was not brought until October, 1915. Nevertheless the defendant claims that the action was prematurely brought. The basis for this contention is that while the scrip certificates were to be issued on February 1, 1915, the holders of such certificates were not entitled under the express language of the resolution to demand either cash or stock on them from the corporation until December 31, 1916, unless the corporation chose prior to that date to honor them, and that even on the latter date the corporation would have an option to pay in cash or stock as it might deem best. Has the corporation lost its rights to determine whether to pay in cash or stock on that date by its rescission of that contract prior to that time, assuming that a contract existed? We shall not at length review the cases relating to anticipatory breaches of executory contracts. The doctrine concerning anticipatory breaches was announced in Hochster v. De La Tour, 2 Ellis & Blackburn, 678, where Lord Campbell held that the man who wrongfully renounced a contract into which he had entered could not justly complain if he was immediately sued for a compensation in damages without awaiting the time when the contract was by its terms to be performed. And in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953 (1900), the cases in England

and in this country were reviewed, and the Supreme Court in an opinion by Chief Justice Fuller laid down the law in similar terms. But while the law is undoubted now that the doctrine announced in the cases above referred to is applicable to certain classes of contracts, still the courts do not agree that the doctrine is applicable to all classes of contracts. In a recent case in the Court of Appeals in New York, that court declares that the rule that renunciation of a continuous executory contract by one party before the day of performance giving the other the right to sue at once for damages is usually applied only to contracts of a special character. Ga Nun v. Palmer, 202 N. Y. 483, 493, 96 N. E. 99, 36 L. R. A. (N. S.) 922 (1911). And in Kelly v. Security Mutual Life Insurance Co., 186 N. Y. 16, 19, 78 N. E. 584, 9 Ann. Cas. 661 (1906), the New York Court of Appeals declared that the doctrine "is not generally applied to contracts for the payment of money at·a future time."

We do not, however, pass on this question as to the right to sue for an anticipatory breach, for in our opinion there was in this case no contract to be breached.

Decree affirmed.