NEW YORK TRUST CO. et al. v. EDWARDS, Collector of Internal Revenue.

UNITED STATES v. ROCKEFELLER.

(District Court, S. D. New York. August 3, 1921.)

1. Corporations ⊚⇒182—Contract requiring purchaser corporation to transfer its shares to vendor's stockholders can be enforced by stockholders.

A contract between two corporations, whereby one sold to the other certain property in consideration of the purchaser's agreement to transfer its shares of capital stock to the stockholders of the vendor in proportion to their stocks in the vendor corporation, is one for the benefit of the stockholders, which probably could be enforced by them directly.

2. Corporations ⊚⇒155(2)—Declaration of dividend gives stockholders vested interest therein.

A declaration of a dividend by a corporation, whether of money or of stock, gives the stockholders a vested interest therein.

3. Internal revenue ⊚⇒7—Dividend declared from accumulated capital of corporation may be income.

A dividend declared by a corporation may be income of the stockholders and taxable as such, though it is paid from surplus accumulated before the tax year, and used by the corporation since its accumulation as economic capital.

4. Internal revenue ⊚⇒7—Shares in other corporations, distributed to stockholders under contract, are taxable, if complete control is acquired over property transferred.

Where one corporation transferred a portion of its tangible property to another corporation in return for stock in the purchaser corporation, which was either distributed directly to the stockholders in the vendor corporation or was distributed to them by dividend declared by the same resolution which adopted the contract, so that the vendor corporation never had any interest in the shares of stock, those shares are taxable as income of the stockholders if the transfer of the tangible property was absolute, so that the purchasing corporation acquired full control over it.

5. Internal revenue ⊚⇒7—Fact that both "corporations" had same stockholders does not prevent distribution of shares from being income.

The fact that both vendor and purchasing corporations had the same body of stockholders does not prevent distribution of the purchasing corporation's shares among the vendor's stockholders for the property sold from being taxable as income of the stockholders, even if the fiction of corporate legal entity be disregarded, since, disregarding such fiction, a corporation is an association of persons to effectuate a given purpose, and two associations, organized for different purposes, are different, though their membership is the same.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Corporation.]

6. Internal revenue ⊚⇒7—Contract held to give new corporation complete control over property, so that stock distributed to shareholders of other corporation was income.

Contracts between oil companies and pipe line companies, whereby the former transferred to the latter their pipe lines, to be operated by the latter, in return for which the pipe line companies distributed their stock directly to the transferor's stockholders, or delivered it to the transferor, which immediately distributed it as a dividend to its stockholders, as effectually severs the pipe line properties from the old corporations as though they had been distributed in kind, so that the stock received by the stockholders is taxable as income.

At Law. Separate actions by the New York Trust Company and others, as executors of William L. Harkness, against William H. Edwards, as collector of internal revenue, and by the United States against John D. Rockefeller. Judgment for defendant in first action, and for the United States in second action.

These cases involve the legality of the income tax levied upon the plaintiff in the Harkness Case and the defendant in the Rockefeller Case. The question turns on the effect of certain corporate actions taken by the Prairie Oil & Gas Company and the Ohio Oil Company during the winter of 1914–15. The Prairie Oil & Gas Company was the owner of pipe line property and oil property, and for reasons not here relevant felt itself forced to separate these two into two separate corporations. In pursuance of that purpose it caused a corporation to be organized known as the Prairie Pipe Line Company. It then made a contract with the pipe line company, by which it was to convey all its pipe line property to it, in consideration of which the pipe line company promised to distribute all its own stock to the stockholders of the oil company in the same proportion as their existing holdings. This was carried out, and the shares of the pipe line company so received by Harkness and Rockefeller were taxed as part of their income for the year in which the shares were issued.

The transaction in the case of the Ohio Oil Company was similar, except that the agreement between it and the Illinois Pipe Line Company, which it organized, required the shares to be transferred direct to the oil company. However, the resolution of the directors of the oil company which accepted the contract, declared as a dividend all the shares to be received from the pipe line company and directed them to be distributed among its stockholders in accordance with their existing holdings. This agreement was carried out as well, and the shares so declared were also taxed as income against Harkness and Rockefeller as in the case of the Prairie Oil & Gas Company. In both cases the pipe line properties represented a surplus above the par value of the oil companies' stock; the conveyances, therefore, left the oil companies' capital unimpaired, and required no reduction in their authorized issues.

Richard S. Holmes, of New York City, and Carl A. Mapes and Newton K. Fox, both of Washington, D. C., for the United States.

George Wellwood Murray and Harrison Tweed, both of New York City, for Harkness and Rockefeller.

LEARNED HAND, District Judge (after stating the facts as above). [1] Neither the Prairie Gas & Oil Company nor the Ohio Oil Company for any moment of time owned the pipe line shares as free assets. This is very clear in the case of the Prairie Company, the transaction in which—observing now the most scrupulous formality—was this. The pipe line company offered to buy the oil company's pipe line assets for $27,000,000, adjusted to actual values, and to give in payment its own shares to be directly distributed by the pipe line company pro rata among the oil company's stockholders. This offer the oil company accepted, and the contract of January 21, 1915, bound the buyer so to distribute the stock, which it did. This was a contract made for the sole benefit of the oil company's stockholders and could probably have been directly enforced by them at law. Hendrick v. Lindsay, 93 U. S. 143, 23 L. Ed. 855; National Bank v. Grand Lodge, 98 U. S. 123, 124, 25 L. Ed. 75 (semble). Yet it was the only contract by which the oil company ever got any conceivable interest in the pipe line shares, and it gave that company no such interest. It had given away its property for a consideration moving directly to third persons.

[2] In the case of the Ohio Company, formally the contract bound the pipe line company to deliver its shares to the oil company, and they thus would have become free assets, if there had been nothing more. However, in the very resolution of the oil company's board of directors, by which the offer of the pipe line company was accepted, the board declared a pro rata distribution of the pipe line shares among its own stockholders. Thus at the moment of concluding the contract by which alone the oil company got any interest in the shares, the property so acquired was declared as a dividend. That declaration gave the stockholders of the oil company an immediate vested right to the dividend so declared. Staats v. Biograph Co., 236 Fed. 454, 149 C. C. A. 506, L. R. A. 1917B, 728 (C. C. A. 2nd), Hopper v. Sage, 112 N. Y. 530, 20 N. E. 350, 8 Am. St. Rep. 771; Raynolds v. Diamond Mills Paper Co., 69 N. J. Eq. 299, 300, 60 Atl. 941.

Therefore I think that Peabody v. Eisner, 247 U. S. 347, 38 Sup. Ct. 546, 62 L. Ed. 1152, does not apply. I agree that, had these shares been once free treasury assets, it would be impossible to distinguish that case; the dividend would have been declared in specific property. But since the shares, even in the case of the Ohio Company were always the property of the stockholders, the transactions must be taken as a whole, and the case determined from their effect upon the rights of the stockholders.

[3, 4] A dividend may be income to the stockholder, though declared out of property which has long since become a part of the economic capital of the corporation. Peabody v. Eisner, supra; Lynch v. Hornby, 247 U. S. 339, 38 Sup. Ct. 543, 62 L. Ed. 1149. True, it must not be a dividend in liquidation. Lynch v. Turrish, 247 U. S. 221, 38 Sup. Ct. 537, 62 L. Ed. 1087. And perhaps it must on that account be from a corporate surplus, since otherwise it is hard to avoid regarding it as in liquidation. But it makes no difference that it distributes to the stockholder property which is not current profit, but the means of producing current profit. He must still pay an income tax upon it, though in his eyes it is a part of his capital. Therefore, in the cases at bar, the only question is of the completeness of severance of the property declared; i. e., the control of it acquired by the stockholder and lost by the corporation.

In Eisner v. Macomber, 252 U. S. 189, 40 Sup. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, the case was of a mere stock dividend, which was held to be no more than new evidence of the stockholder's original ownership. Had the shares been without par value, that would have been literally the case; but they were not. The stock dividend did change the relation of the corporation and the stockholder to the surplus, by permanently impounding it, as it were, in the business, and giving the stockholder a right to insist upon it as an investment, should his fellows later wish to realize it as profit. Yet, though he thus got, and the corporation lost, this element of control over the surplus so declared, it was not regarded as a severance of the property. So far, therefore, Eisner v. Macomber, supra, helps the taxpayers here; it shows that there may be some changes in the relation of the stockholders to the surplus which do not amount to the severance of income.

[5] Nevertheless the cases at bar go further than that case, because in them the surplus was transferred to a new corporation altogether, and the question is whether that distinction changes the result. The taxpayers insist that, if one looks at the very truth of the matter, disregarding corporate forms, this is no difference at all. Although the argument is plausible, it still seems to me that, even when viewed with the utmost disregard of forms, the pipe line properties were completely severed from the oil companies, and that the resulting shares were new property derived from the old shares.

A corporation, stripped of its fictitious personality, is an association of persons mutually agreed upon the execution of more or less definitely expressed purposes, publicly registered as the law requires. In the case of industrial corporations, the personnel of the membership is an immaterial matter; the original members leave as they please and their substitutes enter merely by purchase. Even the number of the members changes from time to time. If so, it is the common purposes and their execution alone that determine the corporation, and whatever substantially changes these changes the corporation itself, and the rights of its stockholders.

The result of the conveyance of the pipe line property was to put it under the contract of an association committed exclusively to its operation as a separate enterprise from that of the oil company. Indeed, this severance in management was the sole result of the transaction, unless there were a surreptitious agreement between the two groups which nullified the dissolution, which is not suggested. Accepting, therefore, the taxpayers' argument that forms should be disregarded, the question is whether a group mutually agreeing to manage the pipe line property independently of the oil property is a different group from one agreeing to manage the pipe line and the oil property jointly. If the association does not depend upon the number or makeup of its membership, but upon its charter, there can be no question that the difference between the two is substantial, because to conduct two businesses as a unity has practical results very different from conducting them in complete independence.

For illustration, let me assume that the pipe line property had been conveyed in specie to the stockholders as co-owners, and that they had incorporated for convenience. The original conveyance to them would have fallen directly within Peabody v. Eisner, supra, and Lynch v. Hornby, supra. It would have made no difference that they had later incorporated. Yet, judged by results, this is exactly what happened; the pipe line was broken from an association committed to its joint management with the oil properties, and consigned to an association which must manage it alone.

Or suppose that the Prairie Pipe Line Company, for example, had been a going concern with property of its own. Upon its acquisition of the pipe line and the issue of its new shares to the oil company stockholders, they would have an interest in an association operating two properties. These new shares would certainly be income in their hands to some extent. Would they be altogether income, or only in the pro-

portion to which, by taking the new shares, they gave up their rights in the old pipe line, and got in exchange an interest in the original property of the Prairie Pipe Line Company? I scarcely think that any one would urge that the new shares were not altogether income. Yet, if so, they would become such only because the pipe line was being conducted in a new joint enterprise by the Prairie Pipe Line Company. Unquestionably the oil company stockholders would to some extent be still holding their old pipe lines and in the same relative proportions.

Or consider, again, the analogy of many of the dissolutions under the Sherman Act. These consisted in no greater separation than was accomplished here, yet it was thought enough to sever the enterprises and create new rights in the new corporations. Nor was it thought to be an answer that the stockholders started out the same. Because the members might join or leave the new group, which conducted only a part of the old business, it was considered that the old group was effectively broken up.

[6] Disregarding, therefore, all formalities, it appears to me, that the pipe line properties were as effectually severed from the old corporations, as though they had been distributed in kind. Indeed, the form adopted was the only practicable way in which they could be so distributed. It is only when one fastens one's attention upon the momentary identity of the two resulting groups that there can be any question of the result. But, as I have perhaps too often said, that identity is nothing unless its continuance is insured for the future by some common agreement between the two. I think that the new shares were income under the law, and that the tax was legal.

Southern Pac. Co. v. Lowe, 247 U. S. 330, 38 Sup. Ct. 540, 62 L. Ed. 1142, is not to the contrary. There the assets taken over had always been in the actual possession and under the control of the corporation. All the shares of the subsidiary were owned by it, and the two were treated as merged. Nothing of the sort is true in the cases at bar. In Gulf Oil Corp. v. Lewellyn, 248 U. S. 71, 39 Sup. Ct. 35, 63 L. Ed. 133, it is indeed true that the property of the subsidiaries was not in the possession of the parent corporation, but it owned all their shares, and they were all "a single enterprise," controlled by it. In no sense did the pipe line companies and the oil companies here remain "a single enterprise." They might in fact be so conducted for a period; but, if so, it would only be by the spontaneous assent of two independent groups of persons. If they remained in fact "a single enterprise," the whole plan was a mere cover.

Phellis v. U. S. Court of Claims, March, 1921, was a case where all the assets were sold to another corporation, which—omitting irrelevant details—gave its own shares, two for one, to the old stockholders, and conveyed its debenture shares to the old company par for par. The result was that the old stockholders had their old shares now represented by the assets of the old corporation—i. e., the debenture shares in the new corporation—and double their original holdings in common shares of the new corporation. Whatever may be the proper answer to the case, with the greatest deference I cannot follow the reasoning of the learned judge, now urged upon me as authorita-

tive. That reasoning is that because the joint value of the old and new shares after the transfer was the same as that of the old shares before, there can have been no income to the stockholder. It may, of course, happen that, in the case of the distribution of the dividends, the value of the old shares does not fall as much as the value of the dividend, though generally the correspondence is pretty close. It does not make any difference, for taxing purposes, whether it does or not. The surplus declared as dividend may or may not be represented in the value of the shares; but, even though it be fully represented, the dividend becomes income as soon as the stockholder gets it. On his books it may appear as a capital distribution, depending on whether he carries his investment at par. That is not to the point. It was not his property before; it has become such by the declaration of the dividend.

Demurrers sustained. Judgment absolute on the demurrers, dismissing Harkness' complaint, and awarding recovery against Rockefeller as prayed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes