**UNITED STATES of America**

v.

**Hyman Harvey KLEIN, Isidor J. Klein, Albert McLennan, George Norgan, Ellis Rosenberg, Maurice Haas, and Morris O. Alprin, Defendants.**

United States District Court
S. D. New York.
June 28, 1955.

See also 18 F.R.D. 439.

J. Edward Lumbard, U. S. Atty., New York City, by Arnold Bauman, Harold R. Tyler, Jr., Joseph De Franco, John J. Donahue, Martin Carmichael, Jr., and Arthur Brooks, Asst. U. S. Attys., and James Riordan, Attorney, Department of Justice, Washington, D. C., for the Government.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Theodore A. Kiendl, William Meagher, John Reed, New York City, and Fred Horowitz, Los Angeles, Cal., of counsel, for defendant Hyman Harvey Klein.

Louis Bender, New York City, for defendant Maurice Haas.

F. Joseph Donohue, Washington, D. C., Michael Kaminsky and Abraham S. Goldstein, Washington, D. C., of counsel, for defendant Morris O. Alprin.

Samuel Becker, New York City, for Irving A. Koerner.

Greenman, Shea, Sandomire & Zimet, and Barr & Barr, New York City, for Albert Roer.

SUGARMAN, District Judge.

At the end of the government's case in the trial of the indictment herein, all defendants moved for judgment of acquittal, Fed.Rules Crim.Proc. rule 29 (a), 18 U.S.C.A., on all counts.

The five count indictment here charges in counts 1, 2 and 3 that, in 1948, defendant Hyman H. Klein filed a federal income tax return which was false in that it treated as a capital gain in 1947 that which was his individual income in 1944, 1945 and 1946; that this constituted an attempt at evasion of Klein's individual income taxes for 1944 (count 1), 1945 (count 2), and 1946 (count 3) and that the eight remaining defendants in said first three counts aided and abetted Klein in each such attempt.

The indictment here further charges in count 4 that the nine named defendants and two co-conspirators combined to attempt to evade the 1944, 1945 and 1946 individual income taxes of said Klein and three other defendants, residents of Canada. The fifth count will be discussed later.

If there were the attempt charged in the first three counts to evade, or the conspiracy charged in the fourth count to attempt to evade, they can only be spelled out of a finding that certain foreign corporations were a sham and that the income of those corporations in 1944, 1945 and 1946 was in reality that of the defendants, the evasion of one of whose individual taxes was attempted,

as charged in the first three counts, or the evasion of four of whose individual taxes was conspired about, as charged in the fourth count.

The recital most favorable to the government of the operation of these foreign corporations is substantially as follows: During 1944, liquor was purchased from a Canadian distiller by Corporation A, a Cuban corporation. It was shipped directly by the distiller to an American wholesaler who was a customer of an American importer. When the invoice for that purchase was received from the Canadian distiller with the necessary shipping papers in Baltimore, Md., in an office of an officer of Corporation A, an employee of that officer would bill the American importer (to whose wholesale customer the shipment had been made) at an increased price. The employee would then present the shipping documents at the New York bank of the American importer and collect against an irrevocable letter of credit. Corporation A would then pay the Canadian distiller.

In 1945 and 1946 the operation was different in that a Panamanian corporation, became Corporation A and was injected (apparently to reduce Cuban taxes) between the distiller and the Cuban corporation so that the transaction then was as follows:

Liquor was purchased from a Canadian distiller by Corporation A, a Panamanian corporation. It was shipped directly by the distiller to an American wholesaler who was a customer of an American importer. When the invoice for that purchase was received from the Canadian distiller with the necessary shipping papers in Baltimore, Md., in an office of an officer of Corporation A, an employee of that officer would bill Corporation B, a Cuban corporation, at an increased price and would on behalf of Corporation B simultaneously bill the American importer (to whose wholesale customer the shipment had been made) at a further increased price. The employee would then present the shipping documents at the New York bank of the American importer and collect against an irrevocable letter of credit. Corporation B would then pay Corporation A or Corporation D, another Panamanian corporation, its share of the proceeds as represented by its invoice and Corporation A or D would then pay the Canadian distiller the amount of its original invoice. Corporation A and/or B and/or D later transferred the retained share of profit to Corporation C, another Panamanian corporation, where the money remained until the liquidation of Corporation C.

Upon such liquidation in 1947 Hyman Harvey Klein, the principal of Corporation C, resident in the United States (the three others were Canadians) paid a capital gains tax on his liquidated share.

Thereby the government claims he fraudulently attempted to evade individual income taxes in 1944, 1945 and 1946 on the profits of the transactions in those years.

If the Cuban and Panamanian corporations were doing business and were not the sham, concealing the joint venture of the United States resident Klein and his three Canadian associates, which the government claims they were, then the first four counts of the indictment must fall. For, if these corporations were commercial enterprises, their income was not that of Klein and his three Canadian associates and, in the absence of such personal income, no attempt to evade tax thereon as charged in the first three counts and no conspiracy to attempt to evade tax thereon as charged in the fourth count could have occurred.

Upon the argument of the motions for judgments of acquittal it was agreed that the test to be applied is: "Giving the government the benefit of all reasonable inferences that might logically flow from the evidence, if a reasonable person could conclude guilt therefrom the motion for judgment of acquittal must be denied and conversely if a reasonable person could not conclude guilt therefrom the motion must be granted".

Such test requires that it be assumed on this motion that this syndicate was

erected by the American resident defendant Klein and his three Canadian associates as a tax maneuver; that a contract with an American importer under which almost half of the whiskey was sold was shaped and supplemented so as to except from United States income tax the profits realized thereunder; that that contract reserved to Klein and his associates dominion over the approval and even selection of salesmen for the American importer and wholesalers to whom it sold and of allocations of the quantities of whiskey to be sold; that in the performance of this contract and all other sales into the United States, defendant Klein, for himself and his associates was the indisputable dominant figure; that Klein and his associates dictated the policies of the seventeen Panamanian and Cuban corporations and of the importers insofar as they concerned this whiskey; and finally that the syndicate and operations in the United States and elsewhere for the entire period were scrupulously geared to gain the immunity suggested by tax counsel (another defendant—Haas) under the decisions of East Coast Oil Co., S. A.[1] and Ronrico Corp.[2]

Under this state of facts the government contends that the jury could find that the seventeen Cuban and Panamanian corporations were mere empty shells and a sham or device to escape United States income taxes and that therefore the profits ostensibly of the syndicate were in truth those of Klein and his Canadian joint venturers.

■ In my view, the Government's position on the first four counts is untenable. On the testimony and exhibits in the case, submission to the jury as an issue the question whether the corporate syndicate above described was an effective shield to the joint venturers against personal income tax liability for the profits of the syndicate in the years when earned would, in effect, have the jury pass on a question of law, namely, whether for tax purposes, any or all of the constituent corporations had an independent personality, "a vexed question at best." [3]

■ For purposes of these motions, I am satisfied that there is ample evidence in the record to compel the conclusion that the whiskey selling operations which produced the income were, in practical effect, a "joint venture" as characterized by the government. Yet, the law is abundantly clear that all corporate operations are in a sense a "joint venture".[4] Therefore, calling the operations of defendant Hyman Harvey Klein and his associates a "joint venture" resulting in personal tax liability to them begs the question. Undoubtedly, the more centralized the control of the corporate structure, the closer in fact do the corporate activities approximate those of a true joint venture. But the close corporation and the "one man" corporation are recognizable as corporate entities for tax and other purposes.[5]

The nature of the problem, which the government would have submitted to the jury as one of fact has been stated by Judge Learned Hand, when as a District Judge, he said in Procter & Gamble Co. v. Newton:[6]

"If our law regarded a corporation as an association of individuals created for purposes defined in their charter, whose extent was measured as we measure that of a consensual mutually agreed upon the execution of more or less definitely expressed purposes, publicly registered as the law requires." New York Trust Co. v. Edwards, D.C., 274 F. 952, 955.

1. 1934, 31 B.T.A. 558, affirmed 5 Cir., 1936, 85 F.2d 322, certiorari denied 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449.

2. 1941, 44 B.T.A. 1130.

3. Harwood v. Eaton, 2 Cir., 68 F.2d 12, 15; see 44 Yale L.J. 436 et seq. (1935); 10 Tax Law Review, 307 et seq. (1955).

4. "A corporation, stripped of its fictitious personality, is an association of persons

5. Burnet v. Commonwealth Imp. Co., 287 U.S. 415, 419, 53 S.Ct. 198, 77 L.Ed. 399.

6. D.C.S.D.N.Y., 289 F. 1013, 1015.

association, like a partnership, an unincorporated society, or a criminal conspiracy, the result would be simpler. Such a corporation would be immanent in everything which was done in execution of its purposes. Or if we had the hardihood to adhere to the rigid convention of a corporation persona, in which, however empty a shell, all rights reside, and to which all duties attach, whatever the strain on our moral predilections, at least we should have a workable concept. As it is, our law has been baffled by the problem, and has wavered between the two alternatives. Since we have had no statute of uses to execute the dry use, I have no great confidence that I can pick a certain path among the cases."

His lack of confidence in his ability to "pick a certain path among the cases" was shown to be justified by his recital of the errors made by the Court of Appeals for the Second Circuit in subsequent decisions wherein that Court sought to express the test applicable in resolving the question of recognizing apparent corporate entities.[7]

■ However, in the National Investors case, Judge Hand adverted to what, in my opinion, is the test to be applied in the instant case and that is

" * * * whatever the purpose of organizing the corporation, 'so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.' [Moline Properties, Inc., v. Commissioner of Internal Revenue] 319 U. S. [436] 439, 63 S.Ct. [1132] 1134, 87 L.Ed. 1499. * * * to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and that escaping taxation is not 'business' in the ordinary meaning. * * * "

■ So applied to the case at bar I must hold that a reasonable person on this record could not find that these corporations were not engaged in "some industrial, commercial, or other activity besides avoiding taxation", or in other words that this syndicate of corporations was a sham.

The government's proof shows that seventeen such Cuban and Panamanian corporations were involved.

In its bill of particulars the government set forth the "nature and source of the income on which it is alleged additional income tax was due" to be the proceeds of the purchase and sale of certain whiskey during 1944, 1945 and 1946 (excluding some small items of interest on bonds and dividends on stock). The government's proof fairly parallels its bill of particulars and both result in a picture where five of the seventeen Cuban and Panamanian corporations [8] (Corporation A in 1944, 1945 and 1946 in the summary of the government's proof, supra) paid the Canadian distillers $17,437,468.84 for the liquor purchased and four of the seventeen Cuban and Panamanian corporations [9] (Corporation A in 1944 and Corporation B and D in 1945 and 1946 in the summary of the government's proof, supra) received from American importers for the same whiskey $38,131,593.69. The government having thus limited itself by its bill of particulars (and it could not have done otherwise) to the income of the four corporations which sold to the American

---

7. National Investors Corporation v. Hoey, 2 Cir., 144 F.2d 466, 467, 468.

8. Agencias, Financiera Lloyds, Douglas Ryan, Cameron Stuart and Angus Kirby (Panama).

9. Agencias, Ramsey Scott, Exportadora Kent and Exportadora de la Costa.

market, the test of the recognition of the corporations for tax purposes must be confined to those four. When thus applied the record is abundantly clear that a reasonable person could not conclude that those corporations were a sham. They observed corporate formalities in their structure and functioning; they billed the American distributors for the whiskey; they collected for it; they paid their suppliers for it; they maintained active bank accounts in Cuba, New York and Canada in their own names and deposited therein and withdrew therefrom large sums in many transactions; in fact they did everything normally to be expected in the sale of over thirty-eight million dollars worth of whiskey at wholesale in the three years of their operation. To suggest that a reasonable person could conclude otherwise on this record would be sheer blindness.

But even if the "source and nature" limitation of the bill of particulars were to permit the inclusion of the five of the seventeen Cuban and Panamanian corporations which purchased the liquor (one—Agencias—having for a time. bought from the Canadian distiller and sold to the American importer) the result would be no different. There too corporate form and activity to a greater or lesser extent is manifest.

Further, if all seventeen as a syndicate were to be subjected to the test, it is equally clear that as a unit they clearly met it and grouped according to their functions, i.e., those which bought from Canada, those which sold to America, those; if any, which intervened between such purchase and such sale and those which acted merely as depositories of the funds, each, to the extent requisite by its functions, did likewise.

But the government would discard such as indisputably (except to the government) meet the test and pass upon those which functioned to a lesser degree. It would have a lay jury in a criminal prosecution in essence make the type of allocation heretofore reserved for the technical skill of the Secretary of the Treasury [10] in determining a civil liability for tax deficiency. So novel and unconscionable a procedure, this court summarily rejects. Even the technical skill of the Secretary has been repeatedly successfully challenged and the decisions still leave the question far from resolved.[11]

It must follow therefore that the seventeen corporations were acceptable entities for tax purposes and not a sham and that their income was theirs and not that of Klein and his three Canadian associates. Klein therefore did not, as charged in Counts 1, 2 and 3 of the indictment attempt to evade individual income taxes in 1944, 1945 and 1946 by the means of reporting on a capital gain basis in 1947 and the remaining eight defendants in those counts could not have aided or abetted him in a crime he did not commit.

Even if I accept the government's argument that the vulnerability of the Fourth Count is not hinged to the first three counts and that one may conspire to attempt to evade taxes and be held answerable therefor even though the taxes were never due, all that follows is that the conspiracy count be tested independently of the substantive counts.

Applying the test to Count 4 I entertain no doubt that a reasonable person could not find upon the record herein that the nine defendants therein named conspired to attempt to evade the income taxes of Klein and his three Canadian associates. for the years 1944, 1945. and 1946.

Upon the foregoing the motion of each defendant for judgment of acquittal as to him on Counts 1, 2, 3 and 4 is granted.

In view of the above holding it becomes unnecessary to treat with the several additional points raised by each de-

---

10. Int.Rev.Code 1954, § 482 and § 7701 (11), 26 U.S.C.A. §§ 482, 7701(11).

11. 4 Tax Law Review, 1948–1949, 131 et seq.; 10 Tax Law Review, 1955, 307, at 325 et seq.

fendant in support of his motion for judgment of acquittal on the first 4 counts.

The fifth count of the indictment presents an entirely different matter. It charges that the defendants therein named, i.e., the American resident defendant, Hyman Harvey Klein, the three Canadians and two other defendants, and certain co-conspirators, but not defendants, did violate 18 U.S.C. § 371 by conspiring to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury in the collection of the revenue, to wit, income taxes.

The inferences fairly to be drawn from the record are these—that in January, 1947, the defendant Klein and his three Canadian associates wound up the activities of the syndicate by transferring the funds into and in the four Panamanian corporations which were the depositories and by the three Canadians retaining three of these depositories and the defendant Klein retaining the fourth, Tivoli Trading Company.

On March 27, 1947, at Klein's direction, checks were drawn each in excess of one quarter of a million dollars out of Tivoli's funds to Panamanian corporate nominees of defendant Alprin, one of the co-conspirators Koerner and Roer. The purpose of these payments is obscured by a veil of contradictions. Klein stated that they were in the nature of a bonus or a gift by him to Alprin, Koerner and Roer for their services in the operations of the syndicate in 1944, 1945 and 1946. Tivoli's books label them as commissions or expenses. Alprin, Koerner and Roer characterized them as dividends upon liquidation of Tivoli of their stock subscriptions in that company, Klein insisting that those stock subscriptions were long before cancelled. Even though the bank drafts, which represented these payments, were obtained in March of 1947, they were delivered with Klein's instructions (which Klein disputes) that they be not cashed and the proceeds thereof did not find their way into the hands of Roer until 1950, and Koerner and Alprin in 1952. Roer in 1950 and Koerner and Alprin in 1952 reported them as capital gains under a liquidation of Tivoli in their several tax returns for the year in which they were cashed. The government charges in Count Five that this constituted a concealment of the nature and source of the income that was designed to impede, impair, obstruct and defeat the Treasury Department in its collection of revenue and that it was the product of a conspiracy to so do.

Regardless of whether the defendants were successful in the alleged attempt to throw sand in the government's eyes and regardless of whether the government knew from other sources the nature of this income in 1950 and 1952, on the record, applying the agreed test, it cannot be said that a reasonable person could not conclude that there was such a conspiracy and that all of the defendants named in the Fifth Count participated therein. Here it must await the determination of a jury whether a conspiracy existed and which of the defendants participated therein.

Under the test, i.e., on the record in its present state, could a reasonable person conclude that the seven defendants therein named and the three co-conspirators and Roer conspired to cause Roer to file an income tax return in 1950 and Koerner and Alprin to file income tax returns in 1952 wherein each treated the funds received by him and originating from Tivoli on a capital gains basis for the purpose of concealing the nature and source of the net income of Alprin, Koerner and Roer during the years 1944, 1945, 1946 and 1947 and thereby impeding, impairing, obstructing and defeating the lawful functions of the Treasury Department in collecting income taxes, three hypotheses present themselves:—(1) the funds were a liquidating dividend due Koerner, Alprin and Roer for their stock in Tivoli; (2) additional income by way of commissions, bonus or even a gift to Koerner, Alprin and Roer for their services in bringing

about the success of the Harwood venture and (3) they were neither.

Treating these hypotheses seriatum, it would appear that the motions for judgment of acquittal on the Fifth Count must be denied. As to the first: a reasonable person could conclude on the record that these funds were a liquidating dividend as claimed by Koerner, Alprin and Roer. If that is so, then at least defendant Klein and the co-conspirator Rokoff conspired to label these funds in the books of Tivoli falsely, i.e., as commissions.

However, a reasonable person could conclude on the record in its present state the second hypothesis:—that these funds were not a liquidating dividend but were additional ordinary income paid to Koerner, Alprin and Roer for their services in the Harwood deal. In that event it would appear that the defendant Alprin at least fraudulently stated, as did Koerner and Roer, that these funds were other than ordinary income when Roer filed his return in 1950 and Koerner and Alprin filed theirs in 1952. Such finding is not in my view limited to a conspiracy between defendant Alprin and co-conspirator Koerner. In view of the testimony exposing the circumstances under which twelve corporations were formed in Cuba by Koerner, Alprin and Roer, i.e., that although the Cuban attorney Valverde undertook the formalities of the formation of these corporations, he did so upon the recommendation, under the guidance and with the active participation of the law firm theretofore representing the interests of the defendant Hyman Harvey Klein and his three Canadian associates, co-defendants, and the payment of these funds to two of those corporations, it might be reasonably concluded on the record as it now stands that the misbranding of these funds in the 1950 Roer return and the 1952 Koerner and Alprin returns was the product of a combine of the seven named defendants and the three named co-conspirators.

Finally, on the record in its present state, a reasonable person could conclude that it was neither a liquidating dividend nor income to Koerner, Alprin or Roer. It must be remembered that these drafts were procured at a time when Klein was in income tax difficulties. The conflict in the testimony between Klein and Rokoff who claimed the payments to have been ordinary income to Koerner, Alprin and Roer, and that of Koerner, Alprin and Roer who claimed it to have been a liquidating dividend, when coupled with the unusual, to say the least, impounding of these substantial funds aggregating over three quarters of a million dollars, might lead to the rational conclusion that a purpose other than that claimed by either side of the dispute as to the character of this money was the fact and that it was to be given the appearance of a legitimate expenditure by Tivoli until the conclusion of Klein's then income tax difficulties after which it would be disposed of in some manner to be agreed upon by the parties. If so, all defendants named in the count could well be found to have participated in a conspiracy to thus throw sand in the government's eyes in the performance of its functions respecting income taxes.

The court rejects the limitation proposed by defendant Alprin that the function allegedly obstructed must be limited to those performed by the Collector of Internal Revenue.

In view of the suggestion in each hypothesis above analyzed that the defendant Klein could be found to have been involved and the further fact that Haas prepared Klein's 1947 return and was (by the testimony of Bennett) indicated to have had a closer contact with the books of at least one of the companies involved, a reasonable person could conclude that his participation was more than that of an accountant who prepares a return from figures given to him by his client, to mention nothing of the inferences that might be drawn from the sale to him by Roer of La Ribera at Klein's behest and the loan to La Ribera by Klein of the $35,000 and Klein's refusal to accept its return after these funds were unfrozen in Canada.

It must be borne in mind that the court is now dealing only with motions for judgments of acquittal and must determine them on the basis of the test previously herein set forth. Were the court to entertain the conviction that it had with respect to the first four counts requiring the granting of acquittals as to those counts, it would not hesitate to do likewise as to the fifth. However, for the reasons above set forth, it does not entertain such convictions with respect to the Fifth Count, and therefore denies these motions for acquittal addressed thereto.

The basis of any of the above outlined hypotheses contemplates the conspiracy to have terminated upon the filing of the Koerner and Alprin returns in 1952. Therefore, under 18 U.S.C. § 3282 the indictments herein were filed well within the period of limitation imposed.

■ The court declines to entertain an application made by defendant Haas—

"The defendant Haas renews all motions that were made in his behalf prior to the trial herein with the same force and effect as if made now, and likewise all motions made prior to the trial by the other defendants which in any way pertain to the offenses charged herein."

Between last Thursday at noon and the reconvention of this trial this morning, the court was given on these motions a 35 page brief by defendant Haas, an 87 page brief by defendant Alprin, a 120 page brief by defendant Klein, a 34 page brief by defendant Koerner, a 46 page brief by defendant Roer and a 164 page brief by the government, not to mention appendices of the evidence by defendant Roer and another by defendant Koerner and transcript of portions of the minutes by defendant Roer running into hundreds of pages. Even if this court were disposed to act as an appellate tribunal and review all motions made by all defendants *prior to the trial*, it would have been a physical impossibility without adjourning this jury trial for an inordinately protracted period. In view of the fact that this court does not know of all motions made by all defendants prior to trial, it will not undertake to advise itself thereof and in the absence of such advice it will not undertake to summarily deny the application because of the possible impact that such denial might have on the rights of any defendant and of the government. For those reasons, the court refuses jurisdiction of that motion, if such it be, under the circumstances presented and defendant Haas, if he is convicted, will have to be content with the normal review of the decisions on these pretrial motions to the extent they may be reviewable.

Defendant Haas' motion to strike government 337 is denied.