**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 97-4342

MIJA S. ROMER,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 97-4343

KHEM C. BATRA,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-96-350-A)

Argued: January 29, 1998

Decided: June 24, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Niemeyer and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** John Hale Shenefield, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Cary Steven Greenberg, GREENBERG, BRACKEN & TRAN, P.C., Alexandria, Virginia, for Appellants. John J. Powers, III, Antitrust Division, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Donald C. Klawiter, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; John M. Tran, GREENBERG, BRACKEN & TRAN, P.C., Alexandria, Virginia, for Appellants. Joel I. Klein, Assistant Attorney General, A. Douglas Melamed, Deputy Assistant Attorney General, Marion L. Jetton, Anthony V. Nanni, James T. Clancy, Kathleen M. Mahoney, Antitrust Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Mija Romer and Khem Batra (Appellants), were tried by a jury for various offenses stemming from their involvement in a conspiracy to rig bids at real estate foreclosure auctions. Both Appellants were convicted of violating the Sherman Act, 15 U.S.C. § 1. In addition, Romer was convicted of bank fraud, in violation of 18 U.S.C. § 1344, and tax fraud in violation of 18 U.S.C. § 371. On appeal, Appellants make various assignments of error with respect to their convictions, and Romer challenges her sentence. Finding no error, we affirm.

I.

Appellants are real estate speculators who, together with others, participated in a conspiracy to limit bidding competition at certain public foreclosure auctions in Fairfax County, Virginia. The purpose of the conspiracy was to hold down the price of auctioned properties by agreeing not to bid against one another at auctions -- an activity commonly known as "bid-rigging." During an auction, most members of the conspiracy would refrain from bidding, while one designated member would bid on and receive the property at a much-reduced

2

price. Following the auction, members of the conspiracy would hold a private auction amongst themselves, at which point they would discuss the price they each would have bid for the property. The person with the highest bid would be given the deed, and the conspirators would divide amongst themselves the money saved by artificially holding down the price of the property.

Under Virginia law, all sales of foreclosed properties must be conducted at public auctions. See Va. Code Ann.§ 55-59(7). If the lender who initiates the foreclosure is an out-of-state entity, a Virginia resident must be appointed to serve as "trustee." See Va. Code Ann. § 55-58.1(2). The trustee has a fiduciary duty to obtain the highest possible purchase price for the property. Following the auction, the trustee remits all proceeds to the appropriate parties -- the lender receives sufficient funds to pay off the mortgage and the remainder is returned to the homeowner or used to satisfy remaining liens.

As a result of their bid-rigging activities, Appellants were indicted by a federal grand jury on September 12, 1996. The indictment charged both Appellants, inter alia, with violating the Sherman Act, 15 U.S.C. § 1, by conspiring to rig bids on nine properties sold at public auction. Appellants were also indicted for conspiracy to evade the payment of federal taxes, in violation of 18 U.S.C.§ 371. Romer was individually indicted for bank fraud, in violation of 18 U.S.C. § 1344, for obtaining a loan by submission of false earnings information.

The case proceeded to a jury trial on January 21, 1997, in the United States District Court for the Eastern District of Virginia. At trial, Romer testified that she had attended and bid at private auctions on ten properties, and Batra admitted his involvement with six. The Government introduced evidence suggesting that members of the conspiracy had been concerned about having their illegal earnings detected and that they had agreed to make auction payments in cash in order to evade the Internal Revenue Service (IRS). Co-conspirator Leo Gulley testified that, following one private auction in March of 1994, members of the conspiracy, including both Appellants, had discussed the danger of creating a "paper trail" by making payments to each other with checks. Those present agreed that all payments would be made in cash. Gulley's testimony was confirmed by that of co-conspirator Alexander Giap, who had become a government infor-

3

mant and surreptitiously tape-recorded a number of the conspiracy's meetings. During one taped conversation, Romer cautioned the others that "you can't report it on your taxes." She later emphasized that "we don't want any check writing between us. If we get caught by IRS, we'll be dead."

The Government also produced evidence regarding Romer's fraudulent effort to obtain a loan from Herbert Bank and Trust Co. in October 1993. The evidence showed that in order to obtain approval for the loan, Romer, who is a CPA, informed bank officials that her gross income for 1992 was approximately $90,000. The bank approved Romer's loan based on her oral statement, but requested that Romer submit a tax return to substantiate her income. In response to that request, Romer submitted a bogus IRS Form 1040, which she claimed to be her 1992 tax return and which overstated her gross income by approximately $85,000.

Appellants were convicted of violating the Sherman Act, and Romer was convicted of bank fraud and conspiracy to defraud the IRS. In determining Romer's sentence, the district court began with a base-offense level of 10, pursuant to U.S.S.G.§ 2R1.1(a). The court then granted a 1-level enhancement, as authorized by U.S.S.G. § 2R1.1(b)(1), for submitting non-competitive bids in an antitrust conspiracy. The court also granted a 2-level enhancement for obstruction of justice, under U.S.S.G. § 3C1.1, based on the court's finding that Romer had intentionally withheld material information during sentencing. After grouping Romer's antitrust and tax conspiracy offenses, pursuant to U.S.S.G. § 3D1.2(c), and combining the result, as required by U.S.S.G. § 3D1.4, with Romer's bank fraud conviction, the court arrived at an offense level of 14. The court then sentenced Romer, within the applicable range, to a term of 18 months imprisonment on each count, followed by a total of 3 years supervised release, and ordered Romer to pay $27,269 in fines and restitution. This appeal followed.

II.

Appellants contend that the district court erred in denying their motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), since the Government failed to demonstrate that the conspiracy's bid-

4

rigging activities involved "commerce among the several states," as required by § 1 of the Sherman Act. We review de novo the district court's decision to deny judgment of acquittal. See United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1401-02 (4th Cir. 1993) (citing United States v. Garcia, 868 F.2d 114, 115 (4th Cir. 1989)). Where, as here, a motion for judgment of acquittal is based on insufficiency of the evidence, the conviction must be sustained if the evidence, when viewed in the light most favorable to the Government, is sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citation omitted). In reviewing the sufficiency of the evidence, we are not entitled to weigh the evidence or to assess the credibility of witnesses,"but must assume that the jury resolved all contradictions . . . in favor of the Government." United Medical, 989 F.2d at 1402 (citation omitted). With these standards in mind, we now consider the merits of Romer's argument.

Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, . . . is hereby declared to be illegal." 15 U.S.C. § 1. The language of the Sherman Act is conspicuous for its breadth. See United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553 (1944) ("Language more comprehensive [than that used in § 1 of the Sherman Act] is difficult to conceive."). Indeed, the Supreme Court has noted that by using the phrase "commerce among the several States," Congress intended the Sherman Act to reach the constitutional limits of the commerce power. See Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 329 n.10 (1991) ("Congress `meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade, and to that end to exercise all the power it possessed.'") (quoting Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435 (1932)).

In a Sherman Act prosecution, the government bears the burden of proving beyond a reasonable doubt a connection between the defendant's activities and interstate commerce.[1] See McLain v. Real Estate

_____

[1] The government's success in demonstrating the required nexus with interstate commerce "is both a critical jurisdictional fact and an element of the substantive offense charged under 15 U.S.C.§ 1. Facts sufficient for the one are sufficient for the other, and vice versa." United States v. Foley, 598 F.2d 1323, 1328 n.2 (4th Cir. 1979).

Bd. of New Orleans, Inc., 444 U.S. 232, 242 (1980). In McLain, the Supreme Court explained that in order to meet its burden the government must "demonstrate by submission of evidence beyond the pleadings either [1] that the defendants' activity is itself in interstate commerce or, [2] if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." 444 U.S. at 242 (citation omitted). The first of these standards allows for application of the Sherman Act where the defendant's allegedly anti-competitive activities "lie directly in the flow of interstate commerce." United States v. Foley, 598 F.2d 1323, 1328 (4th Cir. 1979). Under the second standard, a defendant's conduct, although "wholly local in nature," McLain, 444 U.S. at 241, falls within the ambit of the Sherman Act when, "as a matter of practical economics," the activities "have a not insubstantial effect on the interstate commerce involved," id. at 246 (quoting Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 745 (1976)).

Although the McLain standards are often described as "tests," we explained in Foley that "[o]bviously these are not bright line, mutually exclusive tests," and that it may be "quite possible to analyze a particular pattern of activities without express reliance upon either." 598 F.2d at 1328; see, e.g., Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975). Therefore, although our analysis may be guided by the McLain standards, we are mindful that our goal is to answer the "more general question, whether the activities under alleged restraint have a sufficient nexus with interstate commerce." Foley, 598 F.2d at 1329.

In the present case, Appellants argue that the Government has failed to carry its burden of establishing that their seemingly local bid-rigging activities had the required nexus with interstate commerce. In support of that contention, Appellants point out that the auctions involved Virginia real property; took place entirely within the Commonwealth of Virginia; and that the participants, including the trustee and all non-institutional bidders, were Virginia residents. In light of those facts, Appellants contend that the thrust of the conspiracy's activities was purely local.

We disagree. As an initial matter, we note that the narrow conception of interstate commerce reflected in the Appellants' argument is

6

without support in the law. Determining whether anti-competitive activities are within the reach of the Sherman Act is a practical inquiry, one which requires us to consider the substance of the transaction at issue. In conducting that inquiry, we look beneath the surface of the transaction, with an eye toward assessing its interstate features. We consider not only the location of the transaction and the immediate parties, but all other conceivable links with interstate commerce, including the interests of secondary parties and the passage across state lines of goods and services related to the transaction.

In light of the broad nature of our inquiry, we disagree with the Appellants' characterization of their auction-rigging activities as purely local. The driving force behind each auction was the financial interest of an out-of-state lender, who initiated the auction to recover the balance of an outstanding debt. Although each sale of property was conducted through the conduit of a Virginia trustee, that relationship was one of form rather than substance. In reality, the trustee was a mere resident agent, appointed by the lender to conduct the auction on the lender's terms. Despite superficial appearances, it was the lender who initiated the foreclosure, who directed the terms of the auction, and who, at the close of each sale, received across state lines some portion of the proceeds in satisfaction of its interest in the property. Therefore, we find it inescapable that, far from being purely local events, the auctions were interstate transactions of the most fundamental sort.

Appellants' next contention is that, even assuming the auctions were interstate in nature, the Government has failed to demonstrate, under Goldfarb, 421 U.S. at 784, that the Appellants' participation was "integral" to or "inseparable" from the auctions. Appellants argue that the presence of non-institutional bidders, like themselves, was not necessary to the conduct of the auctions because, even in the absence of non-institutional bidders, the lender's own representative could bid on and receive the property at a price sufficient to cover the outstanding debt.

We find that argument unpersuasive. While it is no doubt true that the auctions could have proceeded in the absence of non-institutional bidders, Appellants were not convicted of rigging bids at hypothetical auctions they did not attend. Their convictions were for collusive

7

behavior at nine auctions which they not only attended, but at which they were the successful bidders. By purchasing property at foreclosure auctions initiated by out-of-state lenders, Appellants assumed a role that was not only integral to but inseparable from the interstate sale of property. We therefore have no difficulty concluding that their activities were in the flow of interstate commerce.

In a final attempt to escape liability under the Sherman Act, Appellants argue, in reliance on United States v. Lopez, 514 U.S. 549 (1995), that the Sherman Act exceeds Congress's power to regulate pursuant to the Commerce Clause, because it grants federal jurisdiction over local activities with only a de minimis or attenuated connection to interstate commerce. However, under the express language of Lopez, an act of Congress is a valid exercise of the commerce power where, as here, the act contains a "jurisdictional element which . . . ensure[s], through case-by-case inquiry, that the [activity] in question affects interstate commerce." Id. at 561. Because we have conducted such an inquiry in the case at bar, we are confident that we have satisfied our obligations under Lopez.

In summary, we hold that when viewed in the light most favorable to the Government the evidence is sufficient to convince a jury beyond a reasonable doubt that the Appellants' bid-rigging activities had the requisite nexus with interstate commerce. We therefore affirm the district court's denial of judgment of acquittal.

III.

Appellants maintain that the district court erroneously stated applicable law when it gave a supplemental jury instruction regarding the meaning of interstate commerce. The instruction included a hypothetical example in which three Virginia Volvo dealers conspired to fix the prices they charged for automobiles received from Volvo of America. The court explained that this type of agreement, "although formed in state, is going to have an impact on interstate commerce . . . [b]ecause part of the goods that are involved here are shipped from out of state . . . ." Hence, the court explained,"one of the things you have to look at in this case is the extent to which you find that there are out-of-state aspects of the real estate foreclosure process." According to Appellants, the court's instruction was erroneous

8

because the use of the automobile analogy improperly compared real property to movable goods, and the instruction focused the jury's attention on the out-of-state aspects of the real estate foreclosure process.

We review the district court's jury instructions "in their entirety and in context." United States v. Muse, 83 F.3d 672, 677 (4th Cir. 1996) (citing Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)). Therefore, we consider the language of the supplemental instruction together with all other instructions given by the district court on the interstate commerce issue. In the present case, Appellants failed to object to the district court's supplemental instruction during trial. Pursuant to Fed. R. Crim. P. 52(b), we are entitled to notice an error not preserved by timely objection only if the defendant can demonstrate that (1) an error occurred, (2) which was plain, and (3) which affected his or her substantial rights. See also United States v. Olano, 507 U.S. 725, 731-32 (1993). Even where such an error is identified, the decision to correct the error remains within the sound discretion of the court of appeals, to be exercised only when the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 732 (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

Upon a thorough review of the record, we cannot say that the district court's instructions were erroneous, let alone plainly erroneous. Contrary to Appellants' contentions, we find the court's choice of an automobile analogy to be appropriate. Although a piece of real estate being sold in interstate commerce does not itself pass across state lines, title certificates, advertising, financing, and other goods and services generated by the transaction pass from state to state as readily as automobiles. And the district court was careful to inform the jury that the focus of their inquiry was not the out-of-state activities themselves, but the relationship or impact of the Appellants' conduct to those activities. We therefore find no error in the district court's instructions.

IV.

Appellants challenge the district court's refusal to grant two jury instructions pertaining to the defense's theory of the case. The first

9

was a Black's Law Dictionary definition of the term "joint venture." According to Appellants, that instruction was necessary "because it defined a joint venture differently from a partnership insofar as it is a `one time group of two or more persons in a business undertaking.'" The second requested instruction was to inform the jury that bid-rigging is only illegal if it is "an agreement between competitors not to bid."

It is well-settled that a district court should grant a jury instruction requested by the defense so long as the instruction has evidentiary foundation and accurately states applicable law. See United States v. Stotts, 113 F.3d 493, 496 (4th Cir. 1997) (citations omitted). Ordinarily, we review the district court's refusal to grant a proposed instruction for an abuse of discretion, see United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992), but in the present case, although Appellants requested that the proposed instructions be given, they failed to object to the district court's denial of those requests. Therefore, under Olano, 507 U.S. at 731-32, our review of the district court's rulings is limited to plain error. See United States v. Arthurs, 73 F.3d 444, 448 (1st Cir. 1996) (applying plain error analysis where defendant requested instruction but failed to object when denied); United States v. Tringali, 71 F.3d 1375, 1380 (7th Cir. 1995) (same), cert. denied sub nom. Hernandez v. United States, 117 S. Ct. 87 (1996).

In the instant case, we are not convinced that the district court's rejection of the proposed instructions was plain error. As the court obviously recognized, the first instruction threatened to confuse the jury's understanding of applicable law. Given that danger, the court's own instruction -- that "forming a partnership or an agreement to bid on a contract [is not] necessarily a violation of the [Sherman A]ct" -- was adequate to inform the jury of the point the defendants sought to make.

As to the second instruction, it is true that bid-rigging is typically defined as an agreement "between competitors" to submit or withhold contract offers from a third party. See United States v. Portsmouth Paving Corp., 694 F.2d 312, 325 n.18 (4th Cir. 1982) ("[C]ollusive bidding is `an agreement between competitors in a bidding contest to submit identical bids or, by preselecting the lowest bidder, to abstain from all bona fide effort to obtain the contract.'") (quoting 1 R. Call-

10

mann, The Law of Unfair Competition, Trademarks and Monopolies 203 (4th ed. 1981)); United States v. Sargent Elec. Co., 785 F.2d 1123, 1127 (3rd Cir. 1986) ("An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes [an act without consequence]."). Here, the district court's instructions, standing alone, informed the jury only that the "critical factor" in a bid-rigging conspiracy is "an agreement between two or more persons to either eliminate, reduce or interfere with competition." While we believe that instruction may have been erroneous, we have no occasion to decide the issue in the case at bar, since even assuming, arguendo, that plain error occurred, it cannot be said that the error affected the Appellants' substantial rights.

We have recently held that to establish the third prong of the Olano plain error analysis in cases of jury misinstruction, the defendant bears the burden of proving that "the error actually affected the outcome of the proceedings," United States v. Hastings, 134 F.3d 235, 240 (4th Cir. 1998) (citations omitted), in other words, "that the jury actually convicted him based upon an erroneous understanding of the [law]," id. at 243 (citation omitted).

In the instant case, Appellants cannot meet their burden of demonstrating actual prejudice, since there was no evidence on which a properly instructed jury could have concluded that Appellants and their cohorts were anything but competitors. According to Appellants' own testimony, members of the conspiracy agreed to hold down the price of auctioned property by not bidding against one another. There was no evidence whatsoever that the purpose of that collusion was, as Appellants have suggested, merely a "partnership" to pool resources, share research, or spread risks. Quite the contrary, all the evidence suggested that the purpose of the conspiracy was to obtain property at artificially depressed prices and to divide the savings among those competitors who refrained from bidding. In light of all this, we find no reason to believe that a properly instructed jury could have acquitted the Appellants, and we affirm their convictions accordingly.

V.

Appellants maintain that the district court erred in admitting two pieces of evidence during trial. We review the district court's rulings

11

for an abuse of discretion. See United States v. Ellis, 951 F.2d 580, 582 (4th Cir. 1991); United States v. Masters , 622 F.2d 83, 87-88 (4th Cir. 1980) (citations omitted). For the reasons stated below, we affirm.

A. Newspaper Article

The first piece of contested evidence is a Washington Post newspaper article that described a recent bid-rigging conviction in the District of Columbia. The Government introduced the article to provide background to a taped conversation that occurred on October 1, 1994, in which the conspirators referred to the article and its discussion of convictions. According to Appellants, the article was inadmissible hearsay under Rules 801 and 802 of the Federal Rules of Evidence, and, in any event, was more prejudicial than probative and should have been excluded under Rule 403.

With respect to the first contention -- that the article was inadmissible hearsay -- the district court held that the article was admissible because it was not offered to prove the truth of its contents, see Fed. R. Evid. 801(c), but rather to place in its proper context the conspirators' taped discussion about the article. The district court cautioned the jury that the article was not offered "to prove the guilt or innocence of any of the defendants in this court or to establish that there was, in fact, a conspiracy in th[e] District[of Columbia]. It simply was introduced in the area of the reactions to the article and certain comments that may have been made about it." In light of the independent relevance of the article and the district court's careful instruction to the jury regarding the limits of its use, we are confident that the article was admissible.

We also reject Appellants' contention that the article was impermissibly inflammatory under Rule 403, which provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." In the present case, although the article may have had some prejudicial impact, we cannot say that such impact substantially outweighed the article's probative value. Moreover, any danger of prejudice was substantially minimized by the district court's careful instructions to the jury that the article was being

12

offered for context only and that the conduct described therein occurred in a different jurisdiction and "may or may not be similar to the conduct involved here." Therefore, we cannot say that the district court abused its discretion by admitting the article into evidence.

B. Plea Agreement

The next piece of challenged evidence is the testimony of co-conspirator Alexander Giap regarding a plea agreement he reached with the Government. When called by the Government to testify at trial, Giap explained that, as a result of his involvement with the conspiracy, he had pled guilty to three felonies, including bid-rigging, which he described as participating in an "agreement not to compete at . . . public auctions." Such was the full extent of evidence heard by the jury regarding Giap's plea agreement. The agreement itself was neither read to the jury nor submitted into evidence.

Although it is generally recognized that the prosecution can introduce evidence of a plea agreement during direct examination of a government witness, that freedom is not unlimited. See United States v. Henderson, 717 F.2d 135, 137 (4th Cir. 1983). Whenever the government offers evidence of a plea agreement, there is a danger that "the agreement may aid the government by indicating the witness's knowledge of the crime or by [conveying] . . . the unspoken message . . . `that the prosecutor knows what the truth is and is assuring its revelation.'" Id. (quoting United States v. Roberts, 618 F.2d 530, 536 (9th Cir. 1980)). To guard against such danger, we have held that the government may elicit testimony regarding a plea agreement only if: (1) the prosecutor's questions do not imply that the government has special knowledge of the witness's veracity; (2) the trial judge instructs the jury on the caution required in evaluating the witness's testimony; and (3) the prosecutor's closing argument contains no improper use of the witness's promise of truthful cooperation. See id. at 138.

In the present case, the district court fully complied with the safeguards laid out in Henderson. At no point during questioning or closing argument did the Government imply special knowledge or guarantee of Giap's veracity, and the district court gave a cautionary instruction that, due to Giap's status as an informant, his testimony

13

must be viewed more critically than that of other witnesses. Therefore, we cannot say that the district court abused its discretion by admitting the challenged testimony.

VI.

Romer contends that the Government's evidence and arguments at trial constituted a variance from her indictment. According to Romer, although her indictment alleged bank fraud by way of submission of false documents, the Government's evidence at trial suggested that she also facilitated fraud by way of oral statements to bank officials.

We have previously explained that a variance occurs when "the evidence at trial establishes facts materially different from those alleged in the indictment." United States v. Kennedy, 32 F.3d 876, 883 (4th Cir. 1994) (citations omitted). Where a variance is found to have occurred, reversal is required only if the defendant demonstrates that the error infringed his or her "substantial rights" and thereby resulted in "actual prejudice." Id. at 883 (citations omitted). In United States v. Fletcher, 74 F.3d 49 (4th Cir.), cert. denied, 117 S. Ct. 157 (1996), we explained that prejudice may result if the variance surprises the defendant at trial and thereby hinders his or her ability to prepare a defense, or if the variance exposes the defendant to the risk of a second prosecution for the same offense, see id. at 53 (citations omitted).

In the case at bar, we are not persuaded that a variance was committed. Although Romer's indictment does not mention oral statements, the language of the indictment is broad and non-exclusive. It alleges that Romer "executed a scheme . . . to defraud a financial institution . . . by means of false and fraudulent pretenses, representations and promises," and that, "[a]s part of the loan application process," Romer submitted a false IRS Form 1040. Although the indictment mentions Romer's false IRS form, it does not exclude other statements or submissions that were part and parcel of the same fraudulent endeavor.

In any event, even assuming, arguendo, that a variance occurred, Romer has failed to demonstrate actual prejudice. Under 18 U.S.C. § 1344, bank fraud consists of "knowingly execut[ing], or attempt[-

14

ing] to execute, a scheme or artifice . . . (2) to obtain [funds] . . . by means of false or fraudulent pretenses, representations, or promises . . . ." Here, even disregarding all evidence of false statements, Romer's conviction could be sustained on the basis of her fraudulent tax form alone. In any event, we are confident that any variance, if indeed one occurred, did not subject Romer to the threat of a second prosecution or hinder her ability to prepare a defense. Therefore, even assuming that the Government's evidence varied from the indictment, no prejudice resulted and we affirm Romer's conviction accordingly.

VII.

Romer claims that the district court erred in denying her motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), since the evidence was insufficient to support her conviction for defrauding the IRS. As discussed previously, we review the district court's ruling on a motion for judgment of acquittal de novo, see United Medical, 989 F.2d at 1401-02, asking whether the evidence, when viewed in the light most favorable to the Government, is sufficient to sustain a finding of guilt beyond a reasonable doubt as to each essential element of the offense, see Jackson, 443 U.S. at 319.

Romer was convicted of conspiracy to evade the payment of federal taxes, in violation of 18 U.S.C. § 371. To prove a violation of § 371 -- often referred to as a Klein conspiracy, see United States v. Klein, 139 F. Supp. 135 (S.D.N.Y. 1955) -- the government must establish: (1) that an agreement existed; (2) that the conspirators committed an overt act in furtherance of the conspiracy; and (3) that the defendant intended to agree to the conspiracy and to defraud the United States. See United States v. Tedder, 801 F.2d 1437, 1446 (4th Cir. 1986) (citation omitted). In the present case, Romer contends that the Government failed to meet its burden as to the first and third elements of its case.

We disagree. With respect to the first element, the Government presented sufficient evidence, by way of tape-recorded conversations, to establish that members of the conspiracy reached an agreement to make private auction payments in cash. At one meeting, Rosen asked Romer, Batra, Giap, and Gulley, "If I'm the successful bidder . . . [d]o I put [it] on my income tax? . . . [I]s this money being reported or

15

not?" Gulley responded by stating, "[S]o what we're saying [is] we go cash . . . ." Romer answered, "Right," and Rosen, Giap, and Gulley agreed. Rosen then emphasized that the parties "can't report [the illegal earnings] on [their] taxes." During a later conversation, Romer reaffirmed to the others the importance of using cash, stating: "Everything that we do from now on has gotta be cash. . . . Because we don't want any check writing between us. If we get caught by the IRS, we'll be dead." In light of this evidence, we have no difficulty concluding that Romer entered into an agreement to refrain from reporting her illegal earnings to the IRS.

As to the third element, Romer contends that the Government's evidence was insufficient to prove a specific intent to defraud the IRS of tax revenues, as opposed to an intent merely to avoid detection for bid-rigging. We find that argument to be unpersuasive. Although it is well-settled that a Klein conspiracy exists only when an objective of the agreement is "to thwart the IRS's efforts to determine and collect income taxes," United States v. Vogt, 910 F.2d 1184, 1202 (4th Cir. 1990) (citations omitted), the evidence here is sufficient to support a determination that such a purpose existed. We are confident that a jury, when faced with the tape-recorded conversations -- including, most notably, Romer's statement that "if the IRS catches us, we'll be dead" -- could reasonably have concluded that Romer was at least in part motivated by the desire to evade the payment of federal taxes. We therefore affirm Romer's conviction for tax fraud.

VIII.

Romer's appeal alleges five assignments of error with respect to her sentence. We have carefully considered each of those contentions, and we find that only two necessitate extended discussion. In reviewing the remaining contentions, we are required by statute to give "due regard to the opportunity of the district court to judge the credibility of the witnesses," and must "accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e) (1988). Questions regarding the legal interpretation of the guidelines are reviewed de novo. See United States v. Daughtrey , 874 F.2d 213, 217 (4th Cir. 1989). With these standards in mind, we address each of Romer's arguments in turn.

16

A. "Non-Competitive Bids"

Romer contends that the district court erred in granting an upward enhancement in her sentence, pursuant to U.S.S.G.§ 2R1.1(b)(1). That provision authorizes a one-level upward enhancement "[i]f the conduct involved participation in an agreement to submit non-competitive bids . . . ." According to Romer, that enhancement was intended to apply only to "bid-rotation" cases and was, therefore, improperly applied in the case at bar.

In support of her argument, Romer relies exclusively on the Seventh Circuit's decision in United States v. Heffernan, 43 F.3d 1144 (7th Cir. 1994). In that case, the defendant was a steel drum manufacturer who had conspired with other manufacturers to sell drums to customers at identical prices. See id. at 1145. The district court granted a one-level enhancement in the defendant's sentence, pursuant to § 2R1.1(b)(1), on the grounds that the conspiracy's activities constituted bid-rigging. On appeal to the Seventh Circuit, the court reversed, holding that price-fixing by way of submission of identical bids was not the sort of behavior to which § 2R1.1(b)(1) was intended to apply. See generally id. at 1146-50. In reaching that conclusion, the court determined, among other things, that § 2R1.1(b)(1) applied only to bid-rotation cases, and that the price-fixing engaged in by the conspiracy did not qualify as bid-rotation. Romer asks us to reach the same conclusions in the case at bar.

We decline to do so. For starters, we are not persuaded that § 2R1.1(b)(1) is limited to bid-rotation cases.[2] The language of the guideline is broad and non-exclusive. It authorizes a one-level enhancement for all cases involving the submission of "non-competitive bids." If the Sentencing Commission intended the enhancement to apply only to bid-rotation cases, it is reasonable to believe that the general term "non-competitive bids" would have been replaced by a more particular term, like "bid-rotation" or "comple-

_____

[2] In Heffernan, the court explained that bid-rotation, which is also sometimes referred to as the submission of "complementary bids," occurs when a group of bidders agree "for each job . . . which of them shall be the low bidder, and the others submit higher bids to make sure the designated bidder wins." 43 F.3d at 1146.

17

mentary bids." That conclusion is strengthened by the fact that § 2R1.1(d)(3) actually uses the term "complementary bids," and discusses such conduct as though it were a sub-category, rather than a synonym, of bid-rigging in general. The lack of similar specificity in § 2R1.1(b)(1) would appear to indicate that the Commission intended the enhancement to apply generally to all forms of bid-rigging.

In any event, even if we assume, arguendo, that § 2R1.1(b)(1) applies only to bid-rotation cases, we are not convinced that auction-rigging is excluded from that category. It was undisputed that, prior to each auction, members of the conspiracy discussed which of them would submit the lowest bid, and the others agreed to abstain from bidding or, at the very least, not to outbid the chosen bidder. Bidding of that nature is complementary in the sense that the bids submitted and withheld are designed to assist the chosen bidder in obtaining the property at the lowest possible price, with the understanding that, over time, each conspirator will receive an appropriate pay-off. That is very different from the conduct faced in Heffernan, where the manufacturers merely agreed to sell their drums for an identical price and no complementary bids were exchanged. Therefore, even assuming that § 2R1.1(b)(1) applies only to bid-rotation, we are confident that auction-rigging falls within that category. We therefore conclude that the district court was justified in granting an upward enhancement.

B. Obstruction of Justice

Romer's final argument is that the district court erred in granting an enhancement in her sentence for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. The court granted the enhancement on the grounds that Romer had failed to provide the probation office with a complete accounting of her assets, which included various lines of credit amounting to over $36,000; the proceeds of seven properties Romer sold during 1996, which totaled more than $400,000; and the proceeds from the sale of a time-share property in Florida, which totaled more than $4,500.

Section 3C1.1 authorizes a two-level upward enhancement "[i]f the defendant willfully obstructed or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense . . . ." The commentary to § 3C1.1 pro-

18

vides a non-exhaustive list of conduct which constitutes obstruction of justice, including "providing materially false information to a probation officer in respect to a presentence . . . investigation for the court." U.S.S.G. § 3C1.1, comment. n.3(h). Under the Guidelines, material evidence is that which, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. n.5.

In the case at bar, Romer maintains that the district court erred in failing to make an explicit finding of materiality with respect to the information withheld from the probation officer. We are unpersuaded. Although it is true that the district court did not make an express finding of materiality, our cases have never held that such a finding is required. Instead, it is sufficient if a finding of materiality may be implied from the court's statements during sentencing. See United States v. Saintil, 910 F.2d 1231, 1233 (4th Cir. 1990). Here, the district court imposed an upward enhancement after providing Romer with the opportunity to explain her failure to be forthcoming with regards to her assets. In response to Romer's explanation that this failure was a mere oversight, the district judge stated,"I have problems with somebody who's a CPA being that lax in remembering the details, especially in a context that's as important as a presentence investigation . . . . [I am unable] to accept your statement that you merely forgot to fully disclose all of your assets." We believe a finding of materiality is implicit in the court's remarks. The court's statements and the context in which they were given reveal that the matter was given careful consideration and that the court believed that Romer had intentionally withheld information material to the presentence investigation.**3** The upward enhancement is therefore affirmed.

_____

**3** Furthermore, because an accurate estimate of a defendant's assets is a prerequisite to the imposition of fines, see U.S.S.G. § 2R1.1, comment. n.2, we cannot say that the district court's finding of materiality was clearly erroneous. See United States v. Hicks , 948 F.2d 877, 886 (4th Cir. 1991) ("The question of materiality [under§ 3C1.1] is a factual determination . . . subject to the clearly erroneous standard of review.") (citation omitted).

IX.

In summary, we affirm the district court on all matters.

<u>AFFIRMED</u>

20