UNITED STATES of America

v.

Robert L. PARRIS, Defendant.

Crim. No. 99–351–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 13, 2000.

Daniel Bell, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Frank W. Dunham, Jr., Cohen, Gettings, Dunham & Harrison, P.C., Arlington, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This prosecution targets a plan by the owners of a small business to fund the operations of the business by taking money from the corporation's employee pension benefit plan. The jury, by general verdict, convicted defendant, one of the owners, of two offenses: a multiple object conspiracy in violation of 18 U.S.C. § 371 and making false statements in violation of 18 U.S.C. § 1027. Now, by various post-verdict motions, each of which is examined

here, defendant seeks to be sentenced for only one of the conspiracy's objects.

## I

Defendant Robert Parris and his co-conspirator, Robert Kossan,[1] were officers and part owners of the Matrix Corporation ("Matrix" or "the corporation"), which was in the business of offering consulting services to the government, chiefly the Department of the Navy. Of the two, Kossan was responsible for the financial side of the business, while defendant focused his efforts on marketing, consulting, and engineering work. Although their formal titles changed over time, this division of responsibilities remained essentially constant.

Beginning in 1985, Matrix offered its employees a 401(k) Profit Sharing Plan and Trust ("the Trust"), a pension benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[2] Defendant and Kossan were the Trust's trustees, and as such they were bound by the fiduciary duties established by federal law, including the duties to diversify the Trust's holdings, to defray reasonable expenses, and to use the Trust's money solely according to the plan's purpose of providing pension benefits.[3] Plan participants contributed to the Trust by having some portion of their paycheck withheld and deposited into the Trust. And, typical of many such plans, this plan allowed plan participants to borrow up to $50,000 from the Trust, provided they did not exceed half of the value of the amount they had contributed. *See* Matrix Corporation Sharing Plan and Trust Agreement 39. Because defendant and Kossan were plan participants as well as trustees, they were entitled to borrow from the Trust, subject to the limits and procedures appli-cable to all plan participants. *See* 29 U.S.C. § 1108(b).[4] But because defendant and Kossan were trustees, federal law governed their transactions with the Trust, and once they deviated from the plan's procedures and limits, they engaged in a "prohibited transaction" and violated the plain terms of ERISA. *See* 29 U.S.C. § 1106 (defining "prohibited transactions" to parties in interest).

In the mid–1980s, Matrix began to experience cash flow problems, which Kossan and defendant sought to alleviate by withdrawing funds from the Trust when necessary to make payroll, pay vendors, and satisfy other expenses of the firm. Because Kossan could not use Trust funds for non-Trust purposes, he could not withdraw funds directly from the Trust for deposit into the corporation's account. To circumvent this restriction, Kossan simply withdrew the money from the Trust in the form of two personal loans to himself and defendant. Defendant and Kossan then, in turn, loaned the proceeds of the Trust loan to the corporation. The transactions were carried out in one of the following three ways:

(i) The first, most circuitous method seems to have been the principal, if not sole method used from the scheme's inception until 1989. This method began by having checks drawn on the Trust payable to defendant and Kossan personally. Next, defendant and Kossan each deposited these checks into their respective personal checking accounts, and each then wrote a check to the corporation. These transactions were documented by the execution of four notes, two reflecting defendant's and Kossan's loan from the Trust, and two reflecting their corresponding loans to Matrix.

---

**1.** Robert Kossan is not a defendant in this case, having earlier pled guilty to a single count criminal information charging him with embezzlement, in violation of 18 U.S.C. § 664.

**2.** ERISA, 29 U.S.C. § 1001 *et seq.; see* 29 U.S.C. § 1002 (defining "pension benefit plan").

**3.** *See* 29 U.S.C. § 1104 (describing fiduciary duties under ERISA).

**4.** In general, a loan from the plan to a "party in interest," which includes plan fiduciaries, is a "prohibited transaction." 29 U.S.C. § 1106(a). An exception exists for loans to parties in interest, provided the parties in interest are subject to the same limitations as plan participants. *See* 29 U.S.C. § 1108(b).

(ii) The second method began as the first: checks were drawn on the Trust and made payable to defendant and Kossan personally. Rather than deposit the checks in their personal accounts, defendant and Kossan, in this instance, simply endorsed the checks and Kossan then deposited the endorsed checks directly into Matrix's account. Although the record does not establish precisely when this method was used, it appears from the testimony of Matrix's in-house accountant that it was used in the 1989–1991 time frame. In this method, as in the first, notes were executed to reflect the various loans.

(iii) The third method was the most direct and least subtle. In this event, checks were drawn on the Trust payable directly to Matrix. The record reflects that, from 1992 until the end of the embezzlement scheme circa 1996, this was the exclusive method of transferring money from the Trust to the corporation. Notwithstanding that this third method bypassed defendant and Kossan altogether, the transactions were documented in the company's and the Trust's records in the same fashion as the other two, namely as four separate loans, one from the Trust to each trustee, and another from each trustee to the corporation.

From time to time, the debts were consolidated and refinanced, so that in 1992, 1993, and 1995, defendant and Kossan executed promissory notes reflecting their debts to the Trust up to that point and establishing a new amortization schedule. Similarly, notes were executed reflecting the total amounts each was owed by Matrix up to that point. Over the course of the scheme, there were a few instances of repayment, in which event Matrix paid some amount toward its obligation under the notes to defendant and Kossan, and defendant and Kossan, in turn, paid a like amount on their corresponding obligations to the Trust.

Although the scheme was not illegal at its inception, it did not take long in becoming so. As noted, any loan in excess of $50,000 from the Trust to a party in interest such as defendant or Kossan was a prohibited transaction. At the outset of the scheme, it appears that defendant's and Kossan's debt to the Trust did not exceed the $50,000 limit. Then, in 1988, the record reflects that defendant and Kossan each owed slightly in excess of $50,000 to the Trust. Although by 1989 the debt again fell below the legal limit, the total owed thereafter surged well above this limit, and remained so for the remaining life of the scheme. Indeed, after 1989, the trustees' debt to the Trust represented a large portion of the Trust's assets. According to the government's case agent, by the end of 1990, defendant and Kossan each owed a total of $295,000, representing over fifty percent of the Trust's value. Not only was the trustees' debt in excess of the plan borrowing limit, it also exceeded the amount they had each contributed to the Trust by over $100,000. Efforts were made to pay down the debt from 1990 to 1993, but in 1994, the trend reversed, and by the end of that year, defendant and Kossan each owed the Trust in excess of $500,000. By 1996, when Matrix finally ceased operations, defendant and Kossan had borrowed more than $1.2 million from the Trust, a debt that comprised 98% of the Trust's assets.

Defendant's and Kossan's wrongdoing was not limited to their excessive withdrawals from the Trust; they also participated in submitting false statements to the Internal Revenue Service ("IRS") and the Department of Labor. In this regard, the trustees were required annually to submit Form 5500 ("the 5500") to the IRS, on which they were to disclose the Trust's transactions, assets, expenses and liabilities for the reported year. The IRS in turn made the 5500 available to the Department of Labor for its review. Kossan, who ultimately signed each 5500, directed the firm's in-house accountant to falsify the 1990 through 1994 forms, for the purpose of concealing his and defendant's massive debt to the Trust. Thus, although the 5500 required disclosure of all loans extended to parties in interest, that figure

was grossly understated for every year from 1990 through 1994. The 5500 also required disclosure of any single debt which accounted for twenty percent of the Trust's total value, and any transaction or related transactions that involved more than twenty percent of the Trust's assets. By 1994, defendant and Kossan were each indebted to the Trust in excess of twenty percent of its value, and the Trust had engaged in related transactions in excess of twenty percent of the value of its assets. None of this was disclosed on the 5500s, as required.

The record is in conflict as to defendant's knowledge of the falsified forms. It is clear that he neither prepared nor signed the 5500s. Indeed, he claimed ignorance of the forms altogether. Britt Noone, a temporary in-house accountant who prepared the 1990 5500, supported this account, as he testified that he never met with defendant to discuss the form. Yet Mitchell Murphy, Matrix's permanent in-house accountant, prepared the 5500 forms for the years 1991 through 1994, and testified that he showed the 1991, 1992, and 1993 forms to defendant, and explained that they contained false information. It appears that he did not discuss the 1994 5500 with defendant.

Following a Department of Labor investigation of the embezzlement scheme, defendant was indicted for one count of conspiracy with multiple objects in violation of 18 U.S.C. § 371, one count of embezzlement, in violation of 18 U.S.C. § 664, one count of making false statements in documents required by ERISA, in violation of 18 U.S.C. § 1027, two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and one count of money laundering in violation of 18 U.S.C. § 1957. The objects of the conspiracy were (i) embezzlement, in violation of 18 U.S.C. § 664, (ii) making false statements, in violation of 18 U.S.C. § 1027, and (iii) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1957.[5]

At trial, the government's case consisted primarily of (i) documents establishing the relevant transactions, (ii) the testimony of the Department of Labor case agent, (iii) testimony that defendant was told about the $50,000 limit on borrowing from the Trust and about the falsified 5500s for 1991 through 1993, and (iv) testimony that defendant knew his debt to the Trust exceeded his Trust contributions. Defendant, in his case, sought to show that until March 1995, he was not aware that his loans from the Trust had exceeded his contributions, and he had similarly overlooked or forgotten the $50,000 limit on borrowing. Thus, his case consisted in large measure of witnesses who testified that defendant (i) did not concern himself with financial matters, (ii) would entrust financial concerns to those close to him (*e.g.,* Kossan and defendant's wife), and (iii) had a strong character for honesty and integrity. Although defendant did not testify, the government, without objection, introduced selected portions of his testimony from a related civil trial.[6]

In the course of trial, the object of the conspiracy and the two counts based on 18

---

5. Defendant was not charged with the substantive crime of laundering money to conceal the money's source, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), even though violation of that statute was alleged as an object of the conspiracy.

6. The scheme spawned two civil suits, as well as this prosecution. The first suit was brought against defendant and Kossan jointly by several plan participants employed in a Matrix satellite office. *See Krumwiede v. Matrix Corp.,* Civ. No. 96–CV–1449 (Filed Oct. 8, 1996). Defendant settled this claim for $179,-

500. The second suit, instigated and funded in part by defendant, was brought by plan participants who were not parties to the first suit. *See Kossan v. Cooper,* Civ. No. 97–CV–1294 (Filed Aug. 19, 1997). Plaintiffs in the second action chose not to sue defendant, but Kossan impleaded him pursuant to Rule 14, Fed.R.Civ.P. *See Cooper v. Kossan,* 993 F.Supp. 375 (E.D.Va.1998) (discussing Kossan's right to contribution from Parris as co-fiduciary under ERISA). In the trial of the second action, defendant testified (i) that he knew that he and Kossan were borrowing from the Trust to fund the company, (ii) that

U.S.C. § 1956(a)(1)(A)(i) were dismissed pursuant to Rule 29, Fed.R.Crim.P.[7] The remaining counts were submitted to the jury, which ultimately convicted defendant on the conspiracy and false statement charges, and acquitted him on the embezzlement count and remaining § 1957 money laundering count. Significantly, the jury's general verdict does not indicate whether the jury unanimously agreed to convict defendant on all, or fewer than all, of the three objects of the conspiracy, and if the latter, which of the three objects it found. This is no minor matter, as in this case, the conspiracy count drives the calculations under the Sentencing Guidelines, which provide that, in general, a person convicted of a multiple object conspiracy "shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). The sentencing range that results from treating defendant as having been convicted of conspiring to commit all three objects of the conspiracy is significantly higher than the range that results from attributing to defendant only one object, say the false statement object.[8] Recognizing this, and pointing to the jury's decision to acquit him of the individual money laundering and embezzlement charges, defendant argues that he should

be sentenced as if the jury had convicted him of conspiracy to commit only the false statement object. In the post-verdict motions at bar, defendant fashions three arguments in aid of this result: (i) He argues that the object based on 18 U.S.C. § 1956(a)(1)(B)(i) should be dismissed for insufficient evidence pursuant to Rule 29, Fed.R.Crim.P., (ii) he argues that the Court should look behind the general verdict and conclude, in light of the evidence and the acquittals, that the jury found only the false statement object, and (iii) he argues that the Court, sitting as a trier of fact pursuant to U.S.S.G. § 1B1.2(d)[9] should find that defendant was not guilty of the embezzlement and money laundering objects, but only of the false statement object. Each of these arguments is separately addressed.

## II

■■■ Defendant's post-verdict Rule 29 motion directed at one of the alleged objects of the conspiracy raises a threshold question of authority, namely whether Rule 29 authorizes a district court to dismiss one object of a multiple object conspiracy where, as here, the conspiracy conviction was returned on a general verdict form that does not specify which object or objects the jury found.[10] This appears to

---

he had "overlooked" the $50,000 limit on plan borrowing, (iii) that he never intended to borrow beyond the amount he had actually contributed to the Trust, and (iv) that he did not learn that he had, in fact, done so until March 1995, when he was asked to sign a promissory note representing in excess of $500,000 of debt to the Trust. At the conclusion of the second trial, defendant was found jointly liable for the amount of $51,000, representing breaches of fiduciary duty that occurred after March 1995. Defendant paid an additional $33,000 when, after his conviction in this case, he was informed that several plan participants had yet to be paid. By the time of sentencing, all the victims of the scheme had received restitution from either Kossan or defendant. Every victim received his or her lost principal, and some received lost interest, as well.

**7.** There was not sufficient evidence that defendant intended to promote criminal activity with the proceeds of the embezzlement. *See* 18 U.S.C. § 1956(a)(1)(A)(i); *United States v. Brown,* 186 F.3d 661, 670 (5th Cir.1999).

**8.** Conviction on all three objects yields a Guidelines range of 51–63 months in prison, whereas conviction on only the false statement object yields a range of 21–27 months.

**9.** *See* U.S.S.G. § 1B1.2(d) application note 5.

**10.** A special verdict form which requires the jury to identify which objects it found would avoid this ambiguity. *See Griffin v. United States,* 502 U.S. 46, 61, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (Blackmun, J., concurring) (noting that special interrogatories should, as a matter of practice, be used to identify which objects of a conspiracy the jury found).

be an unsettled question; the parties have cited no authority directly on point and none has been found. There is no doubt that courts may dismiss objects of a charged conspiracy in advance of, or even during, a trial without dismissing the entire conspiracy count.[11] It is also clear that a general verdict conviction on a multiple object conspiracy does not fail if, on a post-verdict motion, one or more of the objects, but not all, are insufficiently supported in the trial record. The conviction stands provided at least one of the alleged objects passes Rule 29 muster. *See Griffin,* 502 U.S. at 48–58, 112 S.Ct. 466. These principles compel the conclusion that one may not be "acquitted" of a particular object of a conspiracy, because each object of a conspiracy is simply an alternative theory of liability, not a separate crime. *See id.* at 60, 112 S.Ct. 466. Put another way, a post-verdict Rule 29 attack on a conspiracy conviction must encompass all of the conspiracy objects submitted to the jury; an attack on fewer than all the objects could affect only sentencing, not the fact of conviction. And, the proper procedure to follow in this event is found in the Guidelines, not Rule 29. *See* U.S.S.G. § 1B1.2(d) application note 5. Thus, where, as here, a defendant, for sentencing purposes, attacks fewer than all of the objects of a convicted conspiracy on

grounds of insufficient evidence for purposes of sentencing, the Guidelines, not Rule 29, is the proper procedural weapon.

█ In any event, even assuming the propriety of a Rule 29 motion for this purpose, defendant has not established that the § 1956 object should be dismissed for insufficient evidence. It is settled that a conviction may not be overturned for insufficient evidence if "the evidence, when viewed in the light most favorable to the Government, is sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Romer,* 148 F.3d 359, 364 (4th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999). The pertinent money laundering object criminalizes the knowing use of criminally-derived proceeds in a financial transaction designed to obscure the source or nature of those proceeds. *See* 18 U.S.C. § 1956(a)(1)(B)(i).[12] In this regard, the record reflects that at least until 1991, checks were drawn on the Trust payable to defendant and Kossan individually, and promissory notes were executed to memorialize their debt to the fund, and the company's debt to them. The checks from the Trust were either deposited into the trustees' personal accounts (after which the trustees wrote a personal check to Matrix), or the Trust checks were endorsed by defendant and Kossan and deposited directly into a Matrix account.[13]

11. In fact, as noted, an object of the conspiracy was dismissed in the course of this trial. *See also United States v. Conley,* 37 F.3d 970, 975 (3d Cir.1994) (noting that the district court had dismissed an object of a conspiracy in pretrial proceedings, without discussing the propriety of the district court's action); *United States v. Kanchanalak,* 37 F.Supp.2d 1, 3 (D.D.C.1999) (dismissing object of a conspiracy in pretrial motions). As a general rule, if it becomes clear in the course of a trial that the evidence does not support a particular object of a conspiracy, "it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration." *Griffin,* 502 U.S. at 60, 112 S.Ct. 466.

12. The crime of money laundering in violation of § 1956(a)(1)(B)(i) is comprised of the following elements: (i) a financial transaction involving the proceeds of "specified unlawful

activity," which transaction had at least a *de minimis* effect on interstate commerce, (ii) knowledge that the property involved in the transaction was the proceeds of "some form of unlawful activity," and (iii) knowledge that the "transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity." *See United States v. Wilkinson,* 137 F.3d 214, 221 (4th Cir.1998).

13. The act of embezzlement was complete when the checks were written to defendant and Kossan individually. *See United States v. Busacca,* 936 F.2d 232, 239 (6th Cir.1991) ("Here, we conclude that each time Busacca *caused a check to be issued* by the Funds to himself without prior Board approval and without following established Board procedures, a separate violation of § 664 occurred.") *(emphasis added).* It follows, there-

The record also reflects that defendant's and Kossan's debt to the Trust in 1990 and 1991 actually exceeded their contributions to the Trust by a significant margin, so that any loans from the Trust to the trustees would have involved money that other people had contributed. Based on this evidence, the jury could have concluded beyond a reasonable doubt that defendant and Kossan agreed to deposit Trust funds into Matrix's account in the form of personal loans from them to the corporation, so as to conceal the truth that those funds were the proceeds of an embezzlement. Thus, even were a Rule 29 motion appropriate, that motion must fail.

## III

Next, defendant invites the Court to "look behind" the general verdict to determine which objects the jury "must have" found, in light of defendant's acquittal on two of the three substantive offenses. At first blush, defendant's invitation appears reasonable, as the three objects of the conspiracy correspond superficially to each of the substantive offenses, namely, embezzlement, making false statements, and money laundering. Yet, this invitation must plainly be declined. A fundamental tenet of criminal law is that a conspiracy to commit an offense and the offense itself are separate crimes with distinct elements.[14] Importantly, a jury may convict a person of a conspiracy to commit a particular substantive offense, without any evidence that the substantive offense actually occurred.[15] Similarly, a jury may not convict a person for his co-conspirator's actions, under the so-called *Pinkerton*[16] theory of co-conspirator liability, unless the jury finds that the co-conspirator committed the charged crime, a fact the government need not prove to show a conspiracy to commit that crime. *See Jackson*, 167 F.3d at 1285. In other words, a substantive offense and a conspiracy to commit that offense have distinct elements. For that reason, one may not confidently conclude from a jury's acquittal on a substantive offense that the jury did not find a conspiracy to commit that offense.

Nor do the evidentiary principles of collateral estoppel aid the analysis.[17] When a jury acquits a defendant of a charge, the Double Jeopardy Clause prohibits the government from relitigating issues of fact necessarily decided by that acquittal in a subsequent prosecution. *See Ashe v. Swenson*, 397 U.S. 436, 445–46, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Burns*, 990 F.2d 1426, 1435 (4th

---

fore, that the act of endorsing and depositing the checks was a separate transaction from the actual embezzlement, and is properly the subject of a money laundering charge. After 1991, however, Kossan simply made the checks drawn on the Trust payable directly to the corporation. The government does not contend that these transactions constituted money laundering with intent to conceal.

**14.** *See United States v. Jackson*, 167 F.3d 1280, 1285 (9th Cir.1999) ("The evidence necessary to prove conspiracy is clearly distinct from that needed to sustain a conviction for the underlying substantive offense."); *United States v. Hernandez*, 141 F.3d 1042, 1052 (11th Cir.1998) ("Conspiracy and the substantive offense that is the object of the conspiracy are separate and distinct crimes."); *United States v. Cruz*, 111 F.3d 129, 1997 WL 196035, *4 (4th Cir. April 23, 1997) (unpublished disposition) ("[A] charge of conspiracy is separate and distinct from the underlying

crime.") (citation and internal quotation marks omitted).

**15.** *See, e.g., United States v. Hernandez*, 141 F.3d 1042, 1053 (11th Cir.1998) (holding that a person may be guilty of conspiring to commit the federal crime of murder for hire without satisfying the jurisdictional element of the substantive offense).

**16.** *Pinkerton v. United States* teaches that a conspirator may be found guilty for the criminal acts of his co-conspirators committed in furtherance of the conspiracy, when those acts were reasonably foreseeable and committed while the defendant was a part of the conspiracy. *See* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

**17.** Collateral estoppel applies, if at all, as an analogy, as this case does not involve a second prosecution.

Cir.1993). To determine whether a particular fact was found by a jury, a court, in a sense, looks behind a verdict; thus, it must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189 (citation and internal quotation marks omitted). Yet, collateral estoppel bars subsequent prosecution for a crime only when "the fact necessarily determined in the first trial is an *element of the second offense.*" *United States v. Burns*, 990 F.2d at 1435 (emphasis added). Thus, "double jeopardy guarantees are not engaged by collateral estoppel which, if applied, would merely restrict proof but not make conviction impossible." *United States v. Head*, 697 F.2d 1200, 1205 (4th Cir.1982). And, because conspiracy to commit an offense and the actual offense have separate elements,[18] the government may fail to prove the substantive offense in one trial, and not be barred by collateral estoppel from bringing a related conspiracy claim in a second trial. *See United States v. Brackett*, 113 F.3d 1396, 1400 (5th Cir.1997) ("[A]cquittal on the possession charge did not 'necessarily decide' any essential element of the conspiracy charge.").[19] In other words, were this a second prosecution for conspiracy following acquittal on the substantive crimes of embezzlement and money laundering, the principles of collateral estoppel would not bar prosecution for conspiracy to commit those crimes. It follows, in sum, that the analogy to collateral estoppel is unhelpful.

Indeed, the facts of this case illustrate further why the approach used in the collateral estoppel context does not apply here. Based on the evidence at trial, the jury could have found reasonable doubt as to the specific transactions underlying the embezzlement and money laundering charges, acquitted on those two counts, and found that defendant and Kossan conspired to loot the trust fund, make false statements, and launder the proceeds of the embezzlement. Such a result is possible in light of the fact that the government's proof on the substantive counts relied in significant part on the tracing of funds and other documentary proof, whereas the jury could have convicted defendant of conspiracy based on Murphy's testimony alone. Or the jury could have disbelieved Murphy (in whole or in part), concluded that defendant did not know about the embezzlement until March 1995, and convicted him for conspiracy to submit a false statement later that year based on his willful blindness to the debt after that time. It is impossible to know from the verdict what facts the jury found, and for that reason the principles of collateral estoppel do not reveal the jury's intent for purposes of sentencing.[20]

## IV

■ Where, as here, a defendant is convicted of a multiple object conspiracy in a general verdict, the proper procedure for determining which objects of the conspiracy must be considered for sentencing is found in the Guidelines. As noted above, a defendant convicted of conspiracy with multiple objects must be sentenced as if the defendant "had been convicted on a

18. *See supra* text accompanying notes 14–16.

19. For the same reason, a defendant acquitted of conspiracy may be convicted, in a later trial, of the substantive offense that was the object of the conspiracy, without offending the Double Jeopardy Clause. *See United States v. Burns*, 990 F.2d at 1435 ("[D]ismissal of a conspiracy charge need not imply a determination that overt acts did not occur.").

20. Indeed, the briefs on this issue illustrate the perils of inquiring into the course of a

jury's deliberations. Both parties argue extensively about what and whom the jury must have believed or disbelieved to have reached its verdict. The fact that each party reaches different, opposite, and reasonable conclusions about a witness's credibility, each consistent with the jury's verdict, is sound proof that one cannot know whether the jury accepted all, some, or none of a given witness's testimony.

separate count of conspiracy for each offense that [he] conspired to commit." U.S. Sentencing Guidelines Manual § 1B1.2(d). Yet, where the jury does not specify which objects it found, the Guidelines require "the court, sitting as a trier of fact" to determine whether it "would convict the defendant of conspiring to commit that object offense." U.S. Sentencing Guidelines Manual § 1B1.2 application note 5. In doing so, the trial judge must independently determine whether each object was proved beyond a reasonable doubt. *See Jackson,* 167 F.3d at 1285 (beyond a reasonable doubt standard applied in Note 5 analysis); *United States v. McKinley,* 995 F.2d 1020, 1026 (11th Cir.1993) (same).[21]

The first issue is whether the government has met its burden with respect to the embezzlement object, which alleges a conspiracy to violate 18 U.S.C. § 664.[22] Defendant may not be found guilty of this object unless it is clear beyond a reasonable doubt that he and Kossan conspired to remove, without authorization, funds from the Trust beyond the amount that they actually contributed.[23] The evidence that defendant's and Kossan's debt to the Trust grossly exceeded their contributions was uncontested. Thus, the question at trial was whether defendant possessed the requisite intent to conspire with Kossan to embezzle the Trust's funds.

In that regard, there was reasonable doubt at trial as to whether defendant possessed knowledge from which the conspiracy to embezzle may be inferred. Defendant, at the civil trial, testified that he did not intend to borrow more money than he had contributed, and that he did not learn he had done so until March 1995, when he was asked to sign a promissory note for the debt that had accumulated to that point. While defendant's self-serving declaration of ignorance would not by itself overcome the inference that he was willfully blind to Kossan's criminal conduct,[24] defendant's testimony is not in isolation on this record. The defense established that defendant was actually oblivious to the firm's finances, through essentially uncontradicted testimony to the effect that defendant rarely paid attention to administrative and financial details, signed checks and other documents without reviewing their contents, and initialed routing slips without examining the documents to which they were attached. Similarly, defendant's wife testified that she managed the family finances and that defendant had never even balanced the family checkbook. Finally, several witnesses, including employees who were themselves the victims of the embezzlement, testified that defendant had a strong character for honesty, integrity, and trustworthiness. Based on this, it is reasonable to conclude that defendant was honestly ignorant of, and not willfully blind to, the embezzlement scheme that was reflected in the documents presented at trial.[25]

21. Such a procedure provides *more* protection to a defendant than a motion pursuant to Rule 29, Fed.R.Crim.P. In a Rule 29 motion, the government is entitled to the benefit of all inferences drawn from the evidence, and the district court may not judge the credibility of witnesses. A trial judge who sits as a trier of fact draws independent conclusions from the evidence, including conclusions regarding credibility.

22. 18 U.S.C. § 664 provides, in pertinent part, as follows:
   Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

23. *See, e.g., United States v. Stockton,* 788 F.2d 210, 216 (4th Cir.1986) ("The central element of the traditional concept of embezzlement is the conversion of property belonging to another.").

24. *See United States v. Ruhe,* 191 F.3d 376, 384 (4th Cir.1999) (discussing "willful blindness").

25. The government presented substantial documentary evidence which, if read, synthesized, and understood by defendant, would have established that defendant may have

■ The only evidence that defendant knew about Kossan's scheme before March 1995 was Murphy's testimony that he explained everything to defendant as early as 1992. Yet Murphy's credibility is seriously in question, as he was granted immunity,[26] and the crimes for which he was immunized strike at the very heart of his veracity.[27] In addition, as an accountant, Murphy was most aware of the consequences of his and Kossan's actions. Accordingly, it is appropriate to consider Murphy's testimony with great caution. That caution, coupled with the overwhelming character evidence in defendant's favor, is reason to accept defendant's version of the events in this case. In light of that finding, there is reasonable doubt as to whether defendant is guilty of the embezzlement object, and that object may not be considered pursuant to § 1B1.2(d).[28]

■ The next question is whether defendant conspired to commit the crime of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("the concealment object") and 18 U.S.C. § 1957 ("the large transaction object"). The former, as discussed in Part II, criminalizes the use of criminally derived proceeds in a transaction designed to conceal or disguise the source of those proceeds, while the latter criminalizes the use of criminally derived proceeds of value in excess of $10,000 in a financial transaction. These will each be considered in turn.

The concealment object fails for at least two reasons. First, all of the transactions involved in this object occurred before 1992, when Kossan executed checks drawn on the Trust payable to defendant and Kossan individually. As noted, the government did not prove beyond a reasonable doubt that defendant even knew about the embezzlement scheme before March 1995. For the same reasons, it is not clear beyond a reasonable doubt that defendant knew the funds involved in the transactions in question were criminally derived, i.e., the product of the embezzlement. Second, even assuming that plaintiff knew the transactions involved criminally derived proceeds, it is plain that the transactions were not designed to conceal embezzlement. Indeed, the transaction at the heart of this object was first used when borrowing was below the $50,000 limit on plan borrowing, and it was abandoned in favor of direct payments from the Trust to Matrix by 1992,[29] when the embezzlement

known as early as 1992 that his borrowing had exceeded his contributions. Yet the evidence established that the defendant did not read financial documents that crossed his desk. He simply signed documents as he was directed. While the documentary evidence has been well-summarized for trial, so that it is now easy to compare the amount borrowed with the amount contributed for any given year, the evidence suggests that defendant simply lost track of the numbers in the course of his daily work—even assuming that he ever noticed these numbers in the first place.

26. In return for his trial testimony, Murphy was granted so-called "use" immunity for his testimony, and he has been able to retain his CPA license. It is settled that the credibility of an immunized witness should be scrutinized more closely than the credibility of a witness without an incentive to testify. *See United States v. Pupo*, 841 F.2d 1235, 1240 (4th Cir.1988) (holding that the trial court properly instructed a jury to consider the testimony of an immunized witness "with greater care and caution than the testimony of ordinary witnesses") (internal quotation marks omitted).

27. Specifically, Murphy knowingly falsified the 5500s, albeit at Kossan's direction, and he also concealed a portion of his Matrix income from the IRS

28. It is true that defendant was aware of the embezzlement as of March 1995. Therefore, if promissory notes or checks drawn on the Trust had crossed his desk after that time, he would have known that those notes and checks represented further embezzlement. But the evidence at trial did not establish that defendant was aware of the additional transactions after March 1995. Indeed, the jury apparently agreed with this conclusion, as it acquitted defendant of the embezzlement count, which was based on a transaction that occurred in 1996.

29. The parties agree that the direct transactions from Matrix to the Trust do not constitute concealment.

scheme was clearly underway. This alone creates reasonable doubt as to the concealment object.

■ The large transaction object also fails for at least two reasons. In this case, the government presented evidence of only one transaction using criminally derived proceeds of value in excess of $10,000, namely the payment of $12,383.46 to Central Fidelity Bank on June 28, 1995. First, as with the concealment object, it is not clear beyond a reasonable doubt that defendant was part of the conspiracy to embezzle money from the Trust, either before or after March 1995. There being no conspiracy to embezzle, there was no conspiracy to use the proceeds of embezzlement. And second, even assuming that defendant conspired to embezzle after March 1995, it is not clear beyond a reasonable doubt that the conspiracy included the use of criminally derived proceeds of value in excess of $10,000 in a single financial transaction.[30] Consequently, neither money laundering object may be considered pursuant to § 1B1.2(d).

■ Only the false statement object, which is based on 18 U.S.C. § 1027,[31] was proved beyond a reasonable doubt. To convict a defendant of a conspiracy to violate 18 U.S.C. § 1027, the factfinder must find proof beyond a reasonable doubt that defendant and Kossan agreed to submit false statements in documents required by ERISA.[32] As of March 1995, defendant knew that he and Kossan had withdrawn far more money from the Trust than they had contributed. Defendant, as a trustee, also knew that certain documents had to be filed with the IRS and the Department of Labor, even if he was not aware specifically which documents were required. After March 1995, defendant was in a position to reverse Kossan's misdeeds. Yet he simply remained silent, which, given his knowledge of the Trust's reporting requirements, was equivalent to agreeing with Kossan to submit false statements to the government.[33] Therefore, the government has met its burden with respect to the false statement object of the conspiracy, and defendant will be sentenced as to that object alone, pursuant to § 1B1.2(d) application note 5.[34]

---

**30.** This conclusion is bolstered by, though not dependent on, the fact that the jury refused to find defendant guilty on the corresponding substantive offense.

**31.** 18 U.S.C. § 1027 provides as follows:

Whoever, in any document required by Title I of the Employee Retirement Income Security Act of 1974 ... to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

**32.** The elements of a violation of 18 U.S.C. § 1027 are (i) knowingly making false statements or knowingly concealing or failing to disclose facts, (ii) in documentation required by ERISA (including, *inter alia*, documents to be kept on file and documents submitted to a government agency), (iii) when the fact or facts are required to be disclosed in the document, and (iv) when the plan to which the documents relate is an employee welfare benefit plan or pension benefit plan as those terms are defined by ERISA.

**33.** This conclusion is bolstered by, though not dependent on, the jury's finding that defendant was guilty of submitting the falsified 5500 for the 1994 calendar year.

**34.** These rulings, other rulings made in the course of the sentencing hearing, and the sentence imposed (twenty one months incarceration followed by a one year term of supervised release) are recorded in the Sentencing Memorandum filed in this case. *See United States v. Parris*, Crim. No. 99–351–A (Sentencing Memorandum dated March 3, 2000).

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.